[Cite as *State v. Foster*, 2024-Ohio-2924.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | Nos. 21AP-314 |
| v. | : | 22AP-589 |
| | | 23AP-141 |
| Donnell M. Foster, | : | (C.P.C. No. 19CR-2775) |
| Defendant-Appellant. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on August 1, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Kimberly M. Bond*, for appellee. **Argued:** *Kimberly M. Bond*.

**On brief:** [*Mitchell A. Williams*], Franklin County Public Defender, and *Leon J. Sinoff*, for appellant. **Argued:** *Leon J. Sinoff*.

APPEALS from the Franklin County Court of Common Pleas

BOGGS, J.

{¶ 1} In these consolidated appeals, defendant-appellant, Donnell M. Foster, appeals his conviction in the Franklin County Court of Common Pleas for felonious assault, as well as that court's subsequent judgments denying his first petition for postconviction relief and dismissing for lack of jurisdiction his second petition for postconviction relief. For the following reasons, we affirm Foster's conviction, but we reverse the trial court's judgment denying Foster's first petition for postconviction relief without a hearing, and we remand the matter to the trial court with instructions to conduct an evidentiary hearing on that petition, in which Foster claims he was denied his constitutional right to effective assistance of counsel. Finally, we dismiss Foster's appeal from the trial court's judgment dismissing his second petition for postconviction relief.

## I.  FACTS AND PROCEDURAL BACKGROUND

{¶ 2}  Foster was indicted in June 2019 on one count of felonious assault in violation of R.C. 2903.11, a second-degree felony.  The indictment alleged that, on or about April 13, 2019, Foster knowingly caused serious physical harm to William Bell and/or knowingly caused or attempted to cause physical harm to William Bell by means of a deadly weapon, a knife.  Foster waived his right to a jury trial, and the trial court held a bench trial in April 2021.  From August 2019 through sentencing, Foster was represented by appointed counsel, Marianne Sharp.

### A.  Trial

### 1.  The stabbing and preceding events

{¶ 3}  The evidence presented at trial established that, on April 13, 2019, William Bell, Sr. ("Bell"), was stabbed multiple times at a three-bedroom trailer home owned by Bell and his mother, Sylvia Hill ("Sylvia").  Residing in the trailer with Bell and Sylvia at the time were Bell's four children; Bell's sister, Dyanne Hill ("Dyanne"); Bell's friend, Aisha Garrett; and Garrett's three children.  Foster, who was dating Dyanne, was an invited guest on April 13, 2019.  Foster did not dispute that Bell had been stabbed with a knife and had suffered serious physical harm; the only disputed issue at trial was whether Foster was the person who stabbed him.  Resolution of that question depended wholly on the trial court's weighing of the witnesses' credibility.

{¶ 4}  The state presented testimony from Garrett, Bell, and Bell's teenage son, J.B., as well as from five officers or detectives from the Columbus Police Department.  Foster called Sylvia as his only witness.

{¶ 5}  Garrett did not witness the stabbing, but she offered direct testimony about events surrounding it and circumstantial evidence regarding the stabbing itself.  Shortly before the stabbing occurred, a conflict had arisen between Garrett and Dyanne, when Garrett asked whether Dyanne had done something to her car.  Garrett had just returned from a gas station, after noticing what looked to her like sugar and chocolate around her car's gas tank.  When she arrived back at the trailer, Garrett noticed two knives—a "big butcher knife" and a "broken steak knife"—in the grass near where her car had been parked. (Apr. 13, 2021 Tr. at 72.)  Dyanne denied having done anything to Garrett's car and stood up to approach Garrett.  Bell likewise stood, to deescalate the situation.  Garrett testified

that Bell "stood up because he felt like I was about to be attacked." (Apr. 13, 2021 Tr. at 103.) At that point, Garrett exited the trailer, while Foster, Dyanne, Sylvia, Bell, and two of Bell's children, W.B. and J.B., remained inside.

{¶ 6} Garrett was outside, getting her children into her car, when she saw Bell "busting out the door * * * in a panicked mode," bleeding from his chest and arm. *Id.* at 74. She observed Foster follow Bell outside, holding a steak knife. Bell screamed to Garrett, "get in the car. I need to go to the hospital." *Id.* at 75. Garrett drove Bell to Grove City Methodist Hospital. Garrett's children and J.B. were also in the car.

{¶ 7} Bell testified that he and Dyanne had gotten into an argument after Dyanne had raised her voice at Garrett. He testified that Garrett had asked, "Did y'all try to slit my tire, and did y'all put sugar and chocolate in my [gas] tank?" (Apr. 13, 2021 Tr. at 118.) According to Bell, Dyanne got up, saying "Aint no-mother-fucking-body trying to do nothing." *Id.* Bell stated he blocked a swing from Dyanne, grabbed her forearm, and sat her back down. Like Garret, Bell testified that, once Garrett walked outside, the occupants of the trailer were himself, Foster, Dyanne, Sylvia, W.B., and J.B.

{¶ 8} Bell testified, after Garrett went outside, Sylvia, W.B., and J.B. all tried to get between he and Dyanne, at which point Foster became involved. Bell said to Foster, "What, you trying to get in this too? * * * Bro, we can get outside and I'll beat your ass right now." (Apr. 13, 2021 Tr. at 121.) In the fracas that ensued, Bell claimed that Dyanne came at him again and hit him. Bell described Foster coming at him as he moved Sylvia out of the way, as follows:

> [He] come[s] and he swings. Once he swings, I block him. My boxing instincts kick in again. Boom, I block. Knife - - I guess - - I thought I got punched right here, because I blocked it. * * * But as I blocked it, I tried to jab him with the same arm. And when I tried to jab him, my arm went down to the side, and he got me three other times in my body.

(Apr. 13, 2021 Tr. at 122.) Bell did not see a knife in Foster's hand and, before being hit, he thought Foster was going to punch him. Bell identified for the judge the locations of the stab wounds on his body. Bell testified that, after being stabbed, he slammed the screen door open and exited the trailer, bleeding "profusely," and headed toward Garrett's car, telling her to take him to the hospital. *Id.* at 127. He stated that Foster followed him outside with the knife.

{¶ 9} Bell testified that Sylvia threw Foster the keys to the Chrysler Pacifica that was parked in the driveway, which Bell then observed Foster driving behind Garrett's car, while Garrett was driving him to the hospital.

{¶ 10} The state's final witness was Bell's 15-year-old son, J.B., who testified via Zoom video conference, an arrangement that both Foster and his attorney had agreed to. J.B. travelled in the car with Garrett and Bell to Grove City Methodist Hospital and then travelled in the ambulance with Bell when Bell was transferred to Grant Hospital. J.B. spoke with a police detective at Grant Hospital, shortly after Bell had been stabbed. At trial, however, J.B. disavowed his prior statement and claimed that he had falsely told the police only what Bell had told him to say.

{¶ 11} J.B. admitted at trial that, when he spoke to the detective on the day of the stabbing, he stated that Foster had stabbed Bell four times inside the trailer, while he, W.B., Sylvia, and Dyanne were also present. He stated that he and his brother were pushing Bell back, because Dyanne was trying to charge at him, that Foster had pulled out a knife and started "plucking" at Bell, and that Foster had then stabbed Bell four times. (Apr. 14, 2021 Tr. at 236.) He described the knife Foster used as having "sharp teeth." *Id.* But at trial, J.B. claimed that his statement to the detective was false and that Bell had given him all the false details to relay to the police during the ambulance transport from Grove City Methodist Hospital to Grant Hospital. J.B. stated for the first time at trial that he was not in the trailer when Bell was stabbed and that he saw nothing.

{¶ 12} At the time of trial, J.B. was living with his mother, who "really does not like" Bell. *Id.* at 239. J.B. admitted he was not interested in helping his father, whom he claimed had threatened him with physical harm as recently as a couple days before trial. He stated, "I don't want to help the nigga out * * * [b]ecause the nigga just threatened me." *Id.* at 240. J.B. also claimed to have previously heard Bell threaten to "beat [Foster's] ass." *Id.* at 243.

{¶ 13} The final witness to testify about the events surrounding the stabbing was Sylvia, Bell's mother and Foster's sole witness. Like J.B., Sylvia's trial testimony directly contradicted her prior statements to the police.

{¶ 14} Sylvia testified at trial that Bell and Dyanne had a volatile sibling relationship and stated that, on April 13, 2019 and the preceding days, Bell had brandished and threatened to stab Dyanne with a knife. Sylvia testified that Bell, Dyanne, and Garrett were

involved in an argument *outside* the trailer on the day of the stabbing, but she denied seeing anyone attack Bell. Sylvia said she heard the argument and walked outside to put an end to it. She claimed she was leaving to buy new kitchen knives at Sutherland's and that she agreed to drop Foster off at the bus stop and allowed Foster to drive. Sylvia stated that Bell had not been stabbed when she left the trailer with Foster.

{¶ 15} Sylvia testified she returned to the trailer immediately after dropping Foster at the bus stop, having been gone only about five minutes, because she did not have money with her. She claimed the police arrived as soon as she returned to the trailer and parked the car, and they would not let her enter the house to get money and cigarettes. Sylvia acknowledged that Dyanne, who was living with her at the time of trial, continued to speak with Foster in jail almost every night.

{¶ 16} The prosecutor cross-examined Sylvia about inconsistencies between her trial testimony and the statement she gave to the police on the day of the stabbing. Contrary to her trial testimony, Sylvia had originally told the police she had *not* seen Bell threaten anyone with a knife on the day of the stabbing. In her recorded police interview, which was played to refresh her memory at trial, Sylvia did not state she had dropped Foster off at the bus stop, as she had denied having seen Foster at all that day. Finally, in her recorded statement, she told the police she had seen Bell run out of the trailer, clutching his chest, which she forcefully denied at trial: "I did not see him holding his chest. I did not see no blood or nothing." (Apr. 15, 2021 Tr. at 273.)

### 2. The 911 call

{¶ 17} While driving Bell to Grove City Methodist Hospital, Garrett called 911 and passed along in real time, information she was receiving from Bell. Garrett initially told the 911 operator that Bell had been stabbed in the chest by his sister, Dyanne, while inside the trailer. Garrett and Bell can then both be heard on the recording of the 911 call stating that both Dyanne and her boyfriend had a part in it. While describing for the 911 operator what Dyanne was wearing, Garrett stated, "They are in a Chrysler Pacifica right now." (State's Ex. 59 at 3:13.) She did not know if there was anyone remaining at the scene, as she explained, "the man that stabbed" Bell was driving the black Pacifica behind her, with Sylvia in the passenger seat and Dyanne in the backseat. *Id*. at 10:06. Garrett explained at trial

that the black Pacifica had pulled out behind her on the road leading out of the neighborhood. Both Bell and Garrett lost track of the black Pacifica en route to the hospital.

### 3. Bell's hospitalization and identification of Foster

{¶ 18} Shortly after his arrival at Grove City Methodist Hospital, Bell was transported by ambulance to Grant Hospital, where he immediately underwent surgery. J.B. rode in the ambulance with Bell, while Garrett drove herself and her children to Grant Hospital. A police detective interviewed Garrett and J.B. together at Grant Hospital and took photographs of Garrett's car while Bell remained in surgery.

{¶ 19} Bell remained in the hospital for four days. While in the hospital, Bell identified Foster as his assailant in a photo lineup. Bell likewise identified Foster in the courtroom as the person who stabbed him.

### 4. The police investigation

{¶ 20} The testimony from five Columbus police officers and detectives about their respective roles in responding to and investigating this incident was largely unchallenged.

{¶ 21} Officer Shannon Dearwester was the first officer to respond to the trailer. He stated that, although there were "a lot of people outside, * * * I didn't really get any answers" from them about what had happened. (Apr. 13, 2021 Tr. at 194.) Officer Dearwester instructed a young child with a mop and bucket, who appeared to be scrubbing blood stains off the concrete steps in front of the trailer, to stop. After securing the people outside the trailer with the help of another officer, Officer Dearwester went inside to look for a victim and to clear anyone else from inside. Finding no one inside, Officer Dearwester detained Dyanne in the back of his cruiser, but she was not forthcoming with information.

{¶ 22} Detective Scott Polgar responded to Grant Hospital, where he interviewed Garrett and J.B. and took photographs of Garrett's vehicle in the parking garage. Detective Polgar authenticated the photographs of Garrett's vehicle.

{¶ 23} Detective Steven Miller responded to the trailer, spoke with Dyanne and Sylvia, and took photographs around the outside of the trailer. No one on the scene gave any pertinent information about the location of the stabbing, and none of the witness statements led the detectives to take photographs inside the trailer. Photographs taken outside the trailer include photographs of a knife handle found behind a recycling bin, of blood on the porch and pavement, and of a black Pacifica parked in the driveway. Even

though the detectives had assumed the assault occurred outside, Detective Miller testified that the evidence observed at the scene would be consistent with a stabbing victim exiting the trailer and getting into a car.

{¶ 24} Three days later, Detective Miller interviewed and took photographs of Bell in the hospital. As a result of that interview, Detective Miller developed Foster as a suspect and requested the creation of a photo array.

{¶ 25} Detective James Jude created the photo array to be shown to Bell, and Detective Kenneth Trivette acted as a blind administrator and administered the photo array to Bell on April 17, 2019. Bell positively identified Foster as his assailant from the photo array.

{¶ 26} On April 18, 2019, following Bell's identification of Foster from the photo array, Detective Miller executed an affidavit in support of probable cause to arrest Foster. The statement of facts contained in his affidavit misidentified the stabbing victim as "John Dempsey," a mistake that Detective Miller characterized as "a typo," which would not have affected the existence of probable cause. (Apr. 13, 2021 Tr. at 182, 185.)

### 5. The verdict

{¶ 27} The trial court found Foster guilty of felonious assault, as charged, and sentenced him to an indefinite prison term of 8 to 12 years.

### B. Appeals and petitions for postconviction relief

{¶ 28} Foster appealed his conviction in case No. 21AP-314. This court stayed Foster's appeal pending the Supreme Court of Ohio's ruling in *State v. Maddox*, case No. 2020-1266, which the Supreme Court issued on March 16, 2022. *See State v. Maddox*, 168 Ohio St.3d 292, 2022-Ohio-764. This court then extended the stay, pending the Supreme Court's decisions in *State v. Hacker*, case No. 2020-1496, and *State v. Simmons*, case No. 2021-0532, which that court issued on July 26, 2023. *See State v. Hacker*, 173 Ohio St.3d 219, 2023-Ohio-2535. We reactivated Foster's direct appeal on August 21, 2023.

{¶ 29} On August 5, 2022, while his direct appeal was stayed, Foster filed his first petition for postconviction relief. Foster alleged in his petition that he had been denied his constitutional right to the effective assistance of counsel, based in part on the fact that his trial attorney, Marianne Sharp, was facing disciplinary action for misconduct involving neglect and deceit in other cases. Foster argued that Sharp's failures in preparation for and

performance at trial led to the state's case going largely unchallenged. Foster also filed a motion to stay postconviction proceedings to allow him additional time to investigate and to file an amended petition.

{¶ 30} The trial court denied Foster's first petition for postconviction relief and motion to stay on August 29, 2022. It found "unpersuasive" Foster's reliance on Sharp's pending disciplinary proceedings, which stemmed from conduct in other cases, and found "unsubstantiated" Foster's claims based on Sharp's alleged failure to properly investigate, prepare for, and try his case. (Aug. 29, 2022 Decision & Entry at 3.) As to Foster's motion to stay, the court stated that the disciplinary proceedings against Sharp were discoverable more than ten months before Foster's petition was due and that those proceedings involved conduct "wholly unrelated to [Sharp's] conduct in this case." *Id.* at 4. Foster appealed the decision denying his first petition for postconviction relief in case No. 22AP-589.

{¶ 31} On October 7, 2022, Foster filed his second petition for postconviction relief, again raising ineffective assistance of counsel and pointing, in part, to the Board of Professional Conduct's determination that Sharp's pattern of neglect and deceit in six other matters merited an indefinite suspension from the practice of law. In addition to the evidence he submitted in support of his first petition, Foster submitted additional evidence, including his own affidavit, in support of his second petition. This court stayed Foster's appeal in case No. 22AP-589 pending the trial court's ruling on Foster's second petition for postconviction relief.

{¶ 32} The trial court dismissed Foster's second petition for postconviction relief on February 1, 2023, concluding that it lacked jurisdiction to consider that untimely and successive petition, because Foster did not demonstrate the applicability of any of the circumstances set out in R.C. 2953.23(A). The court also held that res judicata barred Foster's second petition, because the issues raised therein were identical to the issues Foster raised in his first petition. Foster appealed the trial court's dismissal of his second petition for postconviction relief in case No. 23AP-141.

{¶ 33} This court reactivated case No. 22AP-589 on March 2, 2023 and consolidated Foster's appeals from the denials of his petitions for postconviction relief. After the Supreme Court decided *Hacker* and *Simmons*, this court reactivated case No. 21AP-314

and consolidated it with Foster's other appeals for purposes of briefing, oral argument, and determination.

## II.  ASSIGNMENTS OF ERROR

{¶ 34}  In his consolidated appellate brief, Foster sets out three assignments of error: (1) "Mr. Foster's Conviction is Against the Manifest Weight of the Evidence" (Appellant's Brief at iii); (2) "Mr. Foster Was Denied his Constitutional Right to the Effective Assistance of Counsel" (*id*. at iii); and (3) "Mr. Foster was Denied His Constitutional Rights to Confrontation and to a Meaningful Defense When the Trial Court Supplanted Face-to-Face Confrontation With Virtual Testimony, Which Resulted in Technical Problems that Thwarted Meaningful Cross-Examination of an Important State Witness" (*id*. at iv).

## III.  ANALYSIS

### A.  First assignment of error: manifest weight of the evidence

{¶ 35}  In his first assignment of error, Foster argues that his conviction for felonious assault is against the manifest weight of the evidence.  Foster's argument concerns only the question of identity; he challenges only the quantum of evidence implicating him as Bell's assailant.

{¶ 36}  Weight of the evidence concerns " 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis sic.)  *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).  "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial."  *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).  A manifest weight challenge can be successful " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' "  *Thompkins* at 387, quoting *Martin* at 175.

{¶ 37}  A "court of appeals must always be mindful of the presumption in favor of the finder of fact" when weighing the evidence as part of a manifest weight analysis.  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21.  It must make " ' "every reasonable

intendment and every reasonable presumption * * * in favor of the judgment and the finding of facts" ' " when determining whether a trial court's judgment is against the manifest weight of the evidence. *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984) fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-92 (1978). "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Id.*

{¶ 38} Foster urges this court to reverse his conviction as being against the manifest weight of the evidence based, in part, on a lack of physical or forensic evidence. But a "lack of physical evidence, standing alone, does not render [a] conviction against the manifest weight of the evidence." *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12. *See also State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16 ("If [witness] testimony is believed then the lack of fingerprints, DNA, footprints or any other type of physical evidence does not render the conviction against the manifest weight of the evidence."). As discussed below, the absence of physical evidence in this case, does not undermine Foster's conviction, in light of Bell's direct testimony and the circumstantial evidence pointing to Foster as the assailant.

{¶ 39} Foster argues that the only direct evidence identifying him as the assailant and supporting his conviction is Bell's testimony, which he maintains is unreliable and unworthy of belief because Bell disliked Foster and had "ample motive to falsely implicate him." (Appellant's Brief at 35.) Bell's testimony might have been the only direct evidence of who stabbed Bell, but it was not, as Foster also suggests, "the sum total of the *admissible* evidence" in support of his conviction, as the record contains other admissible, albeit circumstantial, evidence in support of Foster's conviction. (Emphasis added.) *Id.* "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. Furthermore, "[s]ince circumstantial evidence and direct evidence are indistinguishable so far as the [fact finder's] fact-finding function is concerned, all that is required of the [fact finder] is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *Id.* at 272.

{¶ 40} Bell testified that when he tried to block Foster's initial strike, his arm went limp at his side, and that Foster then struck him three other times. Bell suffered knife wounds to his arm and torso, where he claims Foster struck him. From outside, Garrett observed Bell exit the trailer, bleeding from his arm and chest, followed by Foster, who was holding a knife. Although he recanted his prior statements at trial, J.B. admittedly told the police on the day of the incident that he witnessed Foster stab Bell four times with a knife inside the trailer.

{¶ 41} The essence of Foster's manifest weight argument is that Bell's and Garrett's testimony was not credible and that the trial court should not have afforded any weight to J.B.'s statement to the police, because J.B. testified at trial that it was untrue. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of facts." *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. We must "afford great deference to the [fact finder's] determination of witness credibility" when conducting a manifest weight review. *State v. Albert*, 10th Dist. No. 14AP-30, 2015-Ohio-249, ¶ 14, citing *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 55. In a bench trial, the judge is in the best position to view a witness, observe their demeanor, gestures, and voice inflections, and use those observations to weigh the witness's credibility. *Seasons Coal Co. Inc.*, 10 Ohio St.3d at 80. " 'Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds.' " *State v. Zhu*, 10th Dist. No. 21AP-10, 2021-Ohio-4577, ¶ 34, quoting *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25.

{¶ 42} Foster relies heavily on the fact that Garrett initially identified Dyanne as Bell's assailant during the 911 call, but shortly thereafter Garrett and Bell clarified that both Dyanne and Foster had been involved, and Garrett stated that the *man* who stabbed Bell was driving away from the scene in a black Pacifica. Bell explained that he mentioned both Dyanne and Foster while Garrett was on the 911 call "because they both had a part in coming at me" and had both "tried to jump me." (Apr. 13, 2021 Tr. at 144.) Considering the totality of the testimony regarding both the stabbing incident and the 911 call, the trial court was not required to reject Bell's consistent assertion that it was Foster who stabbed him just because Garrett originally named Dyanne as the assailant to the 911 operator.

{¶ 43} Foster also relies on J.B.'s recantation of his original statement to the police as support for his argument that his conviction is against the manifest weight of the evidence. Although J.B. claimed at trial that he had been lying, he admitted that he originally told the police he saw Foster stab Bell four times. The trial judge was able to view J.B.'s demeanor and evaluate his credibility during his video-conference testimony, and the judge was entitled to disbelieve J.B.'s recantation. The trial judge heard from J.B. that he had no interest in helping his father, who had recently physically threatened him, and observed J.B.'s hostility toward the judicial process, which led the judge to treat J.B. as the court's witness. Further, even without considering J.B.'s original statement to the police as substantive evidence, Bell and Garrett's testimony alone supports a finding of guilt.

{¶ 44} To discredit the verdict and paint Dyanne as a potential assailant, Foster points to a bloody adhesive bandage that is momentarily visible on Dyanne's right hand in the bodycam video from Officer Dearwester that the state played at trial. Foster argues that a self-inflicted knife wound on the hand would be consistent with Dyanne being the perpetrator of the attack against Bell, but the record contains no evidence regarding the wound on Dyanne's hand. Neither the state nor Foster called Dyanne to testify at trial, and neither the bandage nor the underlying wound was mentioned at trial. In any event, Foster's base speculation about Dyanne's wound does not undermine the court's credibility determinations or verdict.

{¶ 45} Foster also argues that the testimony from law enforcement personnel supported a judgment of acquittal, because "a holistic view of the evidence shows that Mr. Foster was *inside* the trailer when Bell was stabbed *outside*." (Emphasis sic.) (Appellant's Brief at 43.) We disagree. Again, Foster's argument boils down to his disagreement with the trial court's credibility determinations. The record contains ample testimony upon which the trial court could have concluded that Foster stabbed Bell inside the trailer, as Bell directly testified and Garrett corroborated by her testimony that she observed Bell burst out of the trailer bleeding, followed by Foster, who was carrying a knife. Based on conversations with Dyanne, Sylvia, and W.B. at the scene, the police did not know where the stabbing occurred. Detective Miller acknowledged that the police limited their investigation to outside the trailer based on the physical evidence found outside, but he did not state that the physical evidence conclusively showed that the stabbing happened

outside. In fact, he admitted that the physical evidence would have been consistent with the victim having been stabbed inside, leaving the trailer, and making his way to a vehicle parked outside. But even assuming the police investigation was lacking, because of the investigators' failure to inspect or take photographs inside the trailer, the trial court was entitled to weigh all the evidence presented and to find credible Bell and Garrett's testimony.

{¶ 46} Finally, as part of his manifest weight argument, Foster points to several pieces of evidence that were not admitted at trial and are not part of the appellate record in Foster's direct appeal. These include a medical article about cuts that may occur on an offender's hand during a knife attack, Foster's own affidavit, and redacted jail records, which Foster submitted to the trial court in support of his second petition for postconviction relief. This court may not consider that evidence in conducting a manifest weight review. "A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402 (1978), paragraph one of the syllabus. Accordingly, our review of the manifest weight of the evidence is limited to the evidence presented at trial, and it does not extend to evidence later submitted in relation to postconviction petitions.

{¶ 47} The trial court was presented with conflicting evidence concerning Bell's stabbing and the events surrounding it, including testimony from witnesses whose trial testimony directly contradicted their earlier statements to the police. The trial court also heard testimony regarding strained relationships and/or outright animosity between Bell and Dyanne, Bell and Foster, and Bell and J.B. The trial court was tasked with reviewing the totality of the evidence, weighing the credibility of the witnesses, and resolving the conflicts in the evidence to reach a verdict. Having considered the evidence as a whole, and affording due deference to the trial court's credibility determinations, we conclude that the trial court did not clearly lose its way and did not create such a manifest miscarriage of justice that would require reversal of Foster's conviction. *See Thompkins* at 387. Accordingly, we overrule Foster's first assignment of error.

**B. Third assignment of error: confrontation clause**

{¶ 48} Before addressing Foster's second assignment of error, concerning ineffective assistance of counsel, we briefly turn to and dispose of Foster's third assignment of error,

in which he claims that, by permitting J.B. to testify by video conference, the trial court deprived Foster of his constitutional rights under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution to confront J.B. and to present a meaningful defense.

{¶ 49} The Sixth Amendment to the United States Constitution affords a criminal defendant "the right * * * to be confronted with the witnesses against him," whereas Article I, Section 10 of the Ohio Constitution provides a criminal defendant the right "to meet the witnesses face to face." Despite differences in the provisions' wording, the Supreme Court of Ohio has held that Article I, Section 10 of the Ohio Constitution provides "no greater right of confrontation than the Sixth Amendment." *State v. Self*, 56 Ohio St.3d 73, 79 (1990). *But see, State v. Carter*, ___ Ohio St.3d ___, 2024-Ohio-1247, ¶ 56 (Fischer, J., concurring) (suggesting that the court should revisit that conclusion in an appropriate case).

{¶ 50} The United States Constitution affords a defendant the right to confrontation, " 'not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' " *Self* at 76, quoting 5 *Wigmore on Evidence* (Chabourn Rev.1974) 150, Section 1395. The Sixth Amendment does not categorically prohibit remote witness testimony, but it " 'reflects a *preference* for face-to-face confrontation at trial.' " (Emphasis in sic.) *Maryland v. Craig*, 497 U.S. 836, 849, (1990), quoting *Ohio v. Roberts*, 448 U.S. 56, 63 (1980). Face-to-face confrontation, however, " 'must occasionally give way to considerations of public policy and the necessities of the case.' " *Id.*, quoting *Mattox v. United States*, 156 U.S. 237, 243 (1895). A defendant's right to confront a witness "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured."[1] *Id.* at 850, citing *Coy v. Iowa*, 487 U.S. 1012, 1021 (1988).

---

[1] In *Craig*, the Supreme Court determined that the reliability of the testimony at issue was otherwise assured when the witness testified under oath before the trier of fact and was subject to cross-examination. *Id.* at 851, 853.

{¶ 51} A defendant and, in appropriate circumstances, a defendant's attorney may waive the defendant's rights under the Confrontation Clause. *State v. Pasqualone*, 121 Ohio St.3d 186, 2009-Ohio-315, ¶ 33.

{¶ 52} Foster argues that the trial court should not have permitted J.B. to testify remotely because it was not necessary to further an important public policy and because the court could not otherwise assure the reliability of J.B.'s remote testimony. A failure to object to a witness testifying remotely waives all but plain error regarding the remote testimony. *See State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 191 ("Because McKelton did not raise hearsay and confrontation-clause objections at trial, he has waived all but plain error"); *State v. Pardon*, 10th Dist. No. 20AP-206, 2022-Ohio-663, ¶ 49. Here, Foster not only failed to object, both he and his attorney expressly *agreed* to J.B. testifying by Zoom. J.B.'s mother, who had been served with an arrest warrant after refusing to bring J.B. to court pursuant to a subpoena, proposed that J.B. testify by Zoom. When the prosecutor presented this proposition in court, Foster's attorney stated, "we would not object in terms of the Zoom testimony." (Apr. 14, 2021 Tr. at 218.) Foster likewise stated he had no objection to J.B. testifying by Zoom.

{¶ 53} A party may not assign as error on appeal what he agreed to at trial. *State v. Hogan*, 8th Dist. No. 71337, 1997 Ohio App. LEXIS 4548, *12 (Oct. 9, 1997). "Under the invited-error doctrine, '[a] party will not be permitted to take advantage of an error which he himself invited or induced.' " *State v. Bey*, 85 Ohio St.3d 487, 493 (1999), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.2d 20 (1986), paragraph one of the syllabus. The invited-error doctrine precludes a claim of even plain error. *See State v. Bogovich*, 10th Dist. No. 07AP-774, 2008-Ohio-3100, ¶ 10. Thus, because both Foster and his counsel agreed that J.B. could testify remotely, any violation of Foster's constitutional rights because of J.B.'s physical absence from the courtroom was invited error and does not constitute grounds for reversal. We therefore overrule Foster's third assignment of error.

## C. Second assignment of error : ineffective assistance of counsel

{¶ 54} Finally, we turn to Foster's second assignment of error, in which Foster broadly claims he was denied his constitutional right to the effective assistance of counsel.

{¶ 55} Both the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee a criminal defendant the right to the

assistance of counsel, which is necessary "to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684 (1984). The " 'right to counsel is the right to the effective assistance of counsel.' " *Id.* at 686, quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970), fn. 14.

{¶ 56} Ohio courts apply the two-component standard set out in *Strickland* as the general test for analyzing a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). The defendant must first establish that counsel's performance was deficient by showing that it "fell below an objective standard of reasonableness." *Strickland* at 688. The appellate court must judge the reasonableness of the attorney's conduct on the facts of the case, viewed as of the time of the conduct, while "indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The second component of the *Strickland* test requires the defendant to make a showing of prejudice, because even professionally unreasonable conduct by counsel does not warrant setting aside a criminal judgment if counsel's conduct had no effect on the judgment. *Id.* at 691. To establish prejudice, the defendant must demonstrate a reasonable probability that the result of the trial would have been different but for counsel's deficiency. *Id.* at 698.

{¶ 57} When, as here, a claim of ineffective assistance of counsel is dependent on facts outside the trial record, the defendant must raise that claim by filing a petition for postconviction relief, because the appellate court's review on direct appeal is limited to the matters contained in the trial record. *State v. Douthat*, 10th Dist. No. 09AP-870, 2010-Ohio-2225, ¶ 19, citing *State v. Tackett*, 11th Dist. No. 2003-A-0091, 2004-Ohio-6705, ¶ 19; *State v. Scott-Hoover*, 3d Dist. No. 3-04-11, 2004-Ohio-4804, ¶ 18, citing *State v. Smith*, 17 Ohio St.3d 98, 101 (1985), fn. 1. A petition for postconviction relief " 'is a means to reach constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues is not contained' in the trial court record." *State v. Brime*, 10th Dist. No. 19AP-446, 2019-Ohio-4343, ¶ 7, quoting *State v. Murphy*, 10th Dist. No. 00AP-233, 2000 Ohio App. LEXIS 6129, *5 (Dec. 26, 2000). "Postconviction review is a narrow remedy, since *res judicata* bars any claim that was or could have been raised at trial or on direct appeal." *State v. Steffen*, 70 Ohio St.3d 399, 410 (1994).

### 1. Standards governing petitions for postconviction relief

{¶ 58} When a criminal defendant has filed a direct appeal of a conviction, the defendant may file a petition for postconviction relief in the trial court pursuant to R.C. 2953.21(A) "no later than [365] days after the date on which the trial transcript is filed in the court of appeals in the direct appeal." R.C. 2953.21(A)(2). Foster raised his ineffective assistance of counsel argument in two petitions for postconviction. The first petition was timely filed under R.C. 2953.21(A). The second was not.

{¶ 59} A trial court has a "gatekeeping role" with respect to whether a petitioner is entitled to a hearing on a petition for postconviction relief. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 51. Before granting a hearing, "the court shall determine whether there are substantive grounds for relief." R.C. 2953.21(D). The court must consider the entirety of the record, as well as any additional evidence filed in relation to the petition. *State v. Bunch*, 171 Ohio St.3d 775, 2022-Ohio-4723, ¶ 24, citing R.C. 2953.21(D). A petition states a substantive ground for relief if it " 'is sufficient on its face to raise an issue that the petitioner's conviction is void or voidable on constitutional grounds, and the claim is one which depends upon factual allegations that cannot be determined by examination of the files and records of the case.' " *Id.* at ¶ 23, quoting *State v. Milanovich*, 42 Ohio St.2d 46 (1975), paragraph one of the syllabus.

{¶ 60} A petition for postconviction relief based on alleged ineffective assistance of counsel "need not definitively establish counsel's deficiency or whether [the petitioner] was prejudiced by it. Instead, the petition must be sufficient on its face *to raise an issue* whether [the petitioner] was deprived of the effective assistance of counsel," based on "factual allegations that cannot be determined by examining the record from his trial." (Emphasis added.) *Id.* at ¶ 27, citing *Milanovich* at paragraph one of the syllabus. A trial court may deny a petition for postconviction relief without an evidentiary hearing if the petition and the supporting materials do not demonstrate that the petitioner has set forth sufficient operative facts to establish a substantive ground for relief. *Brime*, 2019-Ohio-4343 at ¶ 8, citing *State v. Calhoun*, 86 Ohio St.3d 279, 282-83 (1999). But "[i]f the record does not on its face disprove the petitioner's claim, then the court is required to 'proceed to a prompt hearing on the issues.' " *Bunch* at ¶ 24, quoting R.C. 2953.21(F).

{¶ 61} The trial court's exercise of its gatekeeping function in the postconviction relief process is entitled to deference, which extends to the trial court's decision regarding the sufficiency of the facts set forth by the petition and the credibility of any affidavits submitted in support of the petition. *Gondor* at ¶ 52. An appellate court applies an abuse of discretion standard, both when it reviews a trial court's decision regarding its gatekeeping function and when it reviews a trial court's decision granting or denying a postconviction petition. *Id.* at ¶ 52, 58. Under the abuse of discretion standard, to justify reversal, the trial court's decision must be unreasonable, arbitrary, or unconscionable. *State v. Wade*, 10th Dist. No. 20AP-456, 2021-Ohio-4090, ¶ 9, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

### 2. First petition for postconviction relief

{¶ 62} Foster first claimed he was denied his constitutional right to the effective assistance of counsel in his timely first petition for postconviction relief, filed August 5, 2022. Foster argued he was denied the effective assistance of counsel because his attorney, Sharp: (1) was unfit to practice law and was facing an indefinite suspension from the practice of law as a result of ethical violations committed during the time she was representing him; (2) waived his constitutional right to in-person confrontation of J.B. at trial; (3) conducted ineffective cross-examinations of the state's witnesses; and (4) failed to conduct a reasonable investigation or engage in reasonable preparation for trial. Foster also filed with his petition, a motion to stay postconviction proceedings, claiming he needed additional time to investigate the recently discovered "factual underpinnings of the [p]etition." (Aug. 5, 2022 Mot. to Stay and Abey Proceedings on Petition for Post-Conviction Relief at 1.) The trial court denied Foster's petition and motion without a hearing.

{¶ 63} To demonstrate entitlement to a hearing on his petition, Foster "was required to raise in his petition a triable issue of fact, supported by evidence outside the record, whether his trial counsel was deficient and whether that deficiency prejudiced him." *Bunch*, 2022-Ohio-4723 at ¶ 37. In support of his first petition, Foster submitted the Ohio Disciplinary Counsel's amended disciplinary complaint against Sharp, Sharp's answer to that complaint, and the Board of Professional Conduct's report to the Supreme Court of Ohio, in which the Board found clear and convincing evidence to support each count in the

amended disciplinary complaint and recommended that Sharp be indefinitely suspended from the practice of law.

**{¶ 64}** The amended disciplinary complaint alleged that Sharp had "violated the Ohio Rules of Professional Conduct by neglecting client matters, failing to communicate adequately with her clients, making false or misleading representations to clients, failing to return unearned fees, failing to timely deliver client files after termination, mismanaging her client trust account, and failing to provide clients with written notice of her lack of professional liability insurance." (Aug. 5, 2022 Petition for Postconviction Relief, Ex. A at 1.) The amended complaint included eight counts, six of which related to Sharp's conduct in her representation of individual clients, not including Foster. The remaining two counts alleged violations concerning Sharp's client-trust account, her failure to maintain professional liability insurance, and her failure to inform clients that she did not maintain such insurance. In total, the amended complaint alleged 42 violations of the Ohio Rules of Professional Conduct.

**{¶ 65}** Sharp stipulated to all the alleged rule violations except for the alleged violations of Prof.Cond.R. 8.4(c), which prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, contained in Counts 2, 3, and 7 of the amended disciplinary complaint. Sharp's alleged misconduct with respect to four clients—Meadows, M.S., Aqel, and Reynolds—occurred while she was also representing Foster. With respect to each of those clients, Sharp admitted she violated Prof.Cond.R. 1.3, which requires a lawyer to act with reasonable diligence and promptness in representing a client. With respect to Meadows, M.S., and Reynolds, Sharp admitted she violated Prof.Cond.R. 1.4(a)(3), which requires a lawyer to keep the client reasonably informed about the status of the matter. With respect to Meadows, M.S., and Aqel, Sharp admitted she violated Prof.Cond.R. 1.4(a)(4), which requires a lawyer to comply as soon as practicable with a client's reasonable requests for information. In her answer to the amended complaint, Sharp stated, "at relevant times, respondent suffered from mental and physical conditions that impaired her ability to practice law, and contributed to the misconduct alleged in [the] amended complaint." (Aug. 5, 2022 Petition for Postconviction Relief, Ex. B at 6.)

{¶ 66} The Board of Professional Conduct found all the alleged violations proven by clear and convincing evidence. It stated, Sharp "committed multiple offenses and engaged in a pattern of misconduct involving multiple violations against six different clients," *id.*, Ex. C at 38, and "failed either partially or fully, to perform legal services * * * for which she had been paid." *Id.* at 41. The board adopted the parties' jointly recommended sanction and recommended that the Supreme Court indefinitely suspend Sharp's license to practice law.

{¶ 67} Foster argued in his first petition that, given Sharp's admission that she suffered from mental and physical conditions that impaired her ability to practice law during the time she represented Foster, it was unreasonable for her to continue representing him, as Prof.Cond.R. 1.16 requires a lawyer to withdraw from representation if the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client. He also argued that, in her representation of him, Sharp violated: Prof.Cond.R. 1.1, which requires a lawyer to provide competent representation; Prof.Cond.R. 1.3, which requires a lawyer to act with reasonable diligence; Prof.Cond.R. 1.4(a)(2), which requires a lawyer to reasonably consult with a client; and Prof.Cond.R. 1.4(b), which requires a lawyer to explain a matter to the extent reasonably necessary for a client to make an informed decision. Foster argued that Sharp's "lack of thoroughness and preparation was visible throughout the trial." (Aug. 5, 2022 Petition for Postconviction Relief at 12.)

{¶ 68} This court lacks jurisdiction to determine whether an attorney has violated the Rules of Professional Conduct, because the Supreme Court has exclusive jurisdiction over attorney discipline in this state. *State v. Robinson*, 2d Dist. No. 2013-CA-33, 2014-Ohio-1663, ¶ 24, citing *State v. Snyder*, 6th Dist. No. WM-08-004, 2009-Ohio-49, ¶ 35, and *State ex rel. Buck v. Maloney*, 102 Ohio St.3d 250, 2004-Ohio-2590, ¶ 7-8. "Nevertheless, we can look to the rules of professional conduct as a guideline to assess whether an attorney renders ineffective assistance of counsel because the first component of that determination is whether counsel's conduct fell below an objective standard of reasonableness for an attorney." *Id.* at ¶ 25.

{¶ 69} Foster submitted evidence outside the trial record that Sharp had been found by the Board of Professional Responsibility to have committed multiple violations of the

rules of professional conduct with respect to her deficient representation of four other clients during the time she was also representing Foster. Sharp admitted most of those violations and claimed that "at relevant times"—which covered the entire time she was representing Foster—she was "suffer[ing] from mental and physical conditions that impaired her ability to practice law." (Aug. 5, 2022 Petition for Postconviction Relief, Ex. B. at 6.) Foster maintains that those mental and physical conditions would have likewise impaired Sharp's ability to provide him with constitutionally required competent representation, and he argues that Sharp committed the same or similar violations of the professional conduct rules in this case. Nevertheless, without first conducting an evidentiary hearing, the trial court held that the evidence Foster submitted in support of his first petition for postconviction relief "fail[ed] to support his claims that his trial counsel was ineffective whatsoever," because none of the violations alleged in the disciplinary complaint was related to Sharp's representation of Foster. (Aug. 29, 2022 Decision & Entry at 3.) The court similarly discounted Sharp's admission that she was suffering from mental and physical conditions that impaired her ability to practice law, because it was limited to the relevant times and circumstances alleged in the disciplinary complaint. (Aug. 5, 2022 Petition for Postconviction Relief, Ex. B. at 6.) In doing so, the trial court ignored the overlap of the times in which Sharp represented Foster and in which Sharp committed the professional misconduct addressed in the disciplinary complaint.

{¶ 70} The state argues that the mere fact that Sharp faced disciplinary action based on her conduct in unrelated cases does not prove that she did not afford Foster effective representation in his case, and we agree with that argument in principle. In *State v. Brigner*, 2d Dist. No. 04CA72, 2005-Ohio-4524, for example, the Second District rejected an appellant's postconviction claim of ineffective assistance of counsel, which was based solely on the appellant's trial attorney having been suspended from the practice of law for "conduct that ha[d] no connection with or relevance to" the appellant's case. *Id*. at ¶ 17. There, the appellant's attorney had been disciplined for implying to a client in another case that the attorney could improperly influence the judge for a price. *See Dayton Bar Assn. v. O'Brien*, 103 Ohio St.3d 1, 2004-Ohio-3939. The Second District reasonably held that the attorney's unethical behavior in that other case, which led to disciplinary action, did not support an inference that the attorney performed deficiently in representing Brigner. *Id*. at ¶ 17.

{¶ 71} Here, however, Foster did not rely on the bare fact that Sharp had been found to have violated the disciplinary rules in other cases. Unlike in *Brigner*, which involved a single instance of unethical conduct, Sharp was found to have engaged in a pattern of misconduct directly related to her representation of a host of clients, during the same time she was representing Foster. Moreover, unlike the discreet act of unethical conduct in *Brigner*, Sharp's admitted violations of the professional conduct rules related more generally to a failure—and claimed inability—to perform the duties and obligations attendant to the attorney-client relationship. If Sharp had been unable to perform her obligations as a lawyer for the clients named in the disciplinary complaint, it is reasonable to question whether, at the same time, she was able to perform those obligations for Foster. Given the nature of the admitted allegations in the amended disciplinary complaint, Sharp's admission that she suffered from medical conditions that impaired her ability to function as a lawyer, and the overlap of Sharp's representation of Foster and the clients mentioned in the amended disciplinary complaint, we conclude that Foster's first petition for postconviction relief raised an issue whether he received affective assistance of counsel, and that Foster was therefore entitled to an evidentiary hearing on his petition.

{¶ 72} Nor was Sharp's disciplinary action the sole basis Foster raised in support of his ineffective assistance claim in his first petition for postconviction relief. He also alleged numerous deficiencies in Sharp's performance in this case. These included allegations that, before trial, Sharp failed to investigate his case by interviewing other witnesses, failed to request DNA testing of the knife handle found outside the trailer, and failed to subpoena witnesses. He also argued that Sharp was ineffective at trial, in part by not making an effective opening argument, by not effectively cross-examining the state's witnesses, and by not objecting to J.B.'s remote testimony. Foster was not required to *prove* that he was denied effective representation to warrant a hearing on his petition for postconviction relief. He was only required to raise in his petition *a triable issue of fact*, supported by evidence outside the record, as to whether Sharp provided him deficient representation and whether that deficiency prejudiced him. *See Bunch*, 2022-Ohio-4723 at ¶ 37. Coupled with Sharp's admitted struggles with her mental and physical health, which she conceded negatively affected her ability to practice law, and her demonstrated neglect of other clients' cases, all while she was representing Foster, these allegations of specific deficiencies raise

a triable issue of fact whether Sharp's representation of Foster was deficient and whether that deficiency prejudiced Foster. Accordingly, we conclude that the trial court erred in denying Foster's first petition for postconviction relief without first holding an evidentiary hearing on that petition.

### 3. Second petition for postconviction relief

{¶ 73} After appealing the trial court's judgments denying his first petition for postconviction relief, and while his direct appeal from his conviction remained stayed, Foster filed a second petition for postconviction relief in the trial court on October 7, 2022. In support of his second petition, Foster submitted three additional exhibits—an affidavit from Foster dated September 7, 2022, jail visitation records showing four jail visits between Sharp and Foster between January 27, 2020 and April 12, 2021, and Foster's jail medical records from July 2019.

{¶ 74} A court may not consider an untimely or successive petition for postconviction relief unless the petitioner satisfies the two-prong test set out in R.C. 2953.23(A)(1). Under the first prong, as relevant here, the petitioner must show that he "was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief." R.C. 2953.23(A)(1)(a). Under the second prong, the petitioner must show by clear and convincing evidence that, "but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted." R.C. 2953.23(A)(1)(b). Unless the petitioner satisfies both prongs, the trial court lacks jurisdiction to consider the merits of an untimely or successive petition for postconviction relief. *State v. Mason*, 10th Dist. No. 12AP-120, 2012-Ohio-4510, ¶ 8. Because his second petition was both untimely and successive, Foster acknowledged that the trial court's jurisdiction to decide that petition depended on his satisfaction of the requirements in R.C. 2953.23(A)(1)(a) and (b). *See State v. Aponovitch*, 155 Ohio St.3d 358, 2018-Ohio-4744, ¶ 38.

{¶ 75} The trial court dismissed Foster's second petition for postconviction relief upon concluding that Foster did not satisfy the requirements of R.C. 2953.23(A)(1)(a) and (b) and that it therefore lacked jurisdiction to entertain Foster's second petition. In particular, the trial court held that Foster presented no evidence showing that he was unavoidably prevented from timely discovering the facts upon which he relied in his second

petition.  The trial court also found that the issues Foster raised in his second petition were barred by res judicata because they were identical to those raised in his first petition, which the court had already denied on the merits and which decision Foster had already appealed.

**{¶ 76}**  Foster has not assigned as error on appeal the trial court's determination that it lacked jurisdiction over his untimely and successive second petition.  Because Foster has not challenged the jurisdictional basis of the trial court's dismissal of his second petition for postconviction relief in an assignment of error, we dismiss case No. 23AP-141 and offer no opinion on the merits of Foster's second petition for postconviction relief, including whether the trial court correctly determined that it was barred by res judicata.

**{¶ 77}**  For the reasons discussed above, we sustain in part and overrule in part Foster's second assignment of error.

## IV.  CONCLUSION

**{¶ 78}**  For these reasons, we overrule Foster's first and third assignments of error, and we sustain in part and overrule in part Foster's second assignment of error.  We affirm Foster's conviction, but we reverse the trial court's judgment dismissing Foster's first petition for postconviction relief without first holding an evidentiary hearing regarding Foster's claim of ineffective assistance of counsel, and we remand this matter to the trial court with instructions to conduct such a hearing and issue a new decision on the petition. Because Foster did not raise an assignment of error challenging the trial court's dismissal of his second petition for postconviction relief, we dismiss case No. 23AP-141 for lack of jurisdiction.

*Case No. 23AP-141 is dismissed for lack of jurisdiction.*
*Judgment in case No. 21AP-314 is affirmed; judgment*
*in case No. 22AP-589 is reversed, and cause*
*remanded with instructions.*

DORRIAN and LELAND, JJ., concur.