[Cite as *State v. Lindsey*, 2026-Ohio-1567.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

            Plaintiff-Appellee,           :

v.                                                     :

Robert Lindsey,                             :

            Defendant-Appellant.      :

No. 23AP-588
(C.P.C. No. 13CR-1201)

(REGULAR CALENDAR)

D E C I S I O N

Rendered on April 30, 2026

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, *Janet A. Grubb*, and *Seth L. Gilbert* for appellee.
**Argued:** *Seth L. Gilbert.*

**On brief:** *Patrick T. Clark* and *Russell Patterson* for appellant.
**Argued:** *Russell Patterson.*

APPEAL from Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendant-appellant, Robert Lindsey, appeals from the August 31, 2023 entry of the Franklin County Court of Common Pleas denying his amended petition for postconviction relief. For the reasons that follow, we affirm.

## I. PROCEDURAL HISTORY & FACTUAL HISTORY

{¶ 2} On April 5, 2013, a Franklin County Grand Jury indicted Lindsey on one count of aggravated murder, an unclassified felony, in violation of R.C. 2903.01 (Count One), one count of murder, an unclassified felony, in violation of R.C. 2903.02 (Count Two); and one count of felony murder, an unclassified felony, in violation of R.C.

2903.02/2903.11. All three counts concerned the stabbing and death of Lindsey's mother, L.B., on February 20, 2013.

{¶ 3}   This matter proceeded to a jury trial. We have previously summarized the facts and procedural history of the case in Lindsey's direct appeal and incorporate those by reference. *State v. Lindsey*, 2015-Ohio-2169 (10th Dist.). Briefly, on February 20, 2013, Lindsey testified that he came home from school and went upstairs to his bedroom. *Id.* at ¶ 22. L.B. asked Lindsey to help find her cellphone. *Id.* When L.B. could not locate her cellphone, she asked Lindsey if she could use his cellphone, which he complied. *Id.* According to Lindsey, his mother called him back into her room at which point a verbal altercation ensued regarding text messages on his cellphone. *Id.* During the verbal altercation, L.B. "threw something toward him" before he retreated to his room. *Id.* at ¶ 23. According to Lindsey, L.B. entered his room a few moments later and charged him while holding two knives. *Id.* at ¶ 24. Lindsey told law enforcement that he slept with a kitchen knife under his pillow, but it was not one of the knives used in the altercation. Lindsey claimed that L.B. "slammed [him] down, [he] was on the ground, and she swung one of the knives and it snapped and broke." (Further citation omitted.) *Id.* According to Lindsey, they wrestled back and forth before L.B. stabbed him in the left leg with the other knife. Lindsey testified he "just knew after she had stabbed [him] the first time that she wasn't stopping" and that he "knew she was going to kill [him]." (Further citation omitted.) *Id.*

{¶ 4}   Lindsey testified that he acted in self-defense when he grabbed the knife from his mother and stabbed her. *Id.* at ¶ 25. According to Lindsey, when he stabbed his mother, he was lying on his side on the floor. *Id.* After Lindsey stabbed her, he exited the room and "just tried to get away as quickly as possible out of that room." (Further citation omitted.) *Id.* At trial, Lindsey did not recall how many times he stabbed L.B. because the whole incident "was pretty quick." *Id.* Lindsey proceeded to walk downstairs and made a tourniquet out of his belt and a rag. *Id.* at ¶ 26. Lindsey stated that he believed his mother was still alive when he left his bedroom. *Id.* Lindsey went back upstairs to get his cellphone and called 9-1-1. *Id.* Lindsey did not check on his mother because he "didn't know if she was going to come back out and kick [him] or anything like that." (Further citation omitted.) *Id.*

{¶ 5}   When law enforcement arrived, Lindsey stated that he "didn't do anything," but he intended that comment to convey that his mother initiated the altercation and tried to kill him. (Further citation omitted.) *Id.* at ¶ 27. During the interview with police, Lindsey told the detective that he was 19 years old and a senior at New Albany High School. *Id.* at ¶ 6. "Almost immediately, Lindsey told the detectives that he 'never thought that [L.B.] would actually stab [him]" but that "she's done it before [. . .] with a fork" when he was 14 years old. *Id.* Lindsey later testified that he did not plan on killing his mother and that he only acted because his mother was going to kill him. *Id.* at ¶ 27. Despite Lindsey's claim that L.B. might come after him, Lindsey acknowledged that he left the knife in the room with his mother and only returned upstairs to retrieve his cellphone. *Id.* at ¶ 47. Lindsey conceded that once he gained control of the knife, he could have fled the room instead of stabbing L.B. *Id.* The deputy coroner testified that most of L.B.'s seven stab wounds were on her back consistent with someone attacking her from behind. *Id.*

{¶ 6}   On July 15, 2014, the jury returned guilty verdicts for Counts Two (murder) and Three (felony murder). Lindsey was found not guilty on Count One (aggravated murder). On September 3, 2014, the trial court held a sentencing hearing pursuant to R.C. 2929.19. The trial court found that Count Three, for purposes of sentencing, merged with Count Two, and sentenced Lindsey to 15 years to life in prison. *Id.* at ¶ 29.

{¶ 7}   Lindsey filed a direct appeal in this matter. On June 4, 2015, we overruled Lindsey's four assignments of error and affirmed the judgment of the trial court. *Id.* at ¶ 62. On September 2, 2015, Lindsey filed an application to reopen his appeal, pursuant to App.R. 26(B), based on ineffective assistance of appellate counsel for failing to assign two assignments of error related to the trial court's self-defense jury instructions. On January 21, 2016, we denied the application finding "Lindsey has failed to establish a colorable claim of ineffective assistance of appellate counsel." *State v. Lindsey*, 10th Dist. No. 14AP-751 (Jan. 21, 2016 Memorandum Decision).

{¶ 8}   On February 5, 2016,[1] Lindsey filed an amended postconviction motion to vacate and set aside judgment, pursuant to R.C. 2953.21, that raised seven grounds for relief. After a brief extension of time, the state filed an answer and partial motion to dismiss

---

[1] The original petition was filed on November 4, 2015.

Lindsey's postconviction petition on February 26, 2016. While the state argued that it would "demonstrate both that trial counsel did not render deficient performance and also that defendant was not prejudiced," it acknowledged that the first four grounds for relief required a hearing. (Feb. 26, 2016 Answer & Partial Mot. to Dismiss at 5.) The state, however, moved to dismiss grounds five through seven without a hearing.

{¶ 9} On November 30, 2018, the trial court denied grounds five through seven without an evidentiary hearing. Relevant to the instant appeal, the trial court found that ground seven was dismissed as "among other assignments of error, this argument was advanced by Petitioner in his Application for Reopening on his direct appeal filed on September 2, 2015 alleging ineffective assistance of appellate counsel." (Nov. 30, 2018 Entry at 28.) The trial court reasoned that the "grounds for this claim of Petitioner were within the record and could have been raised on direct appeal" and, therefore, are barred under res judicata. *Id.* at 28. Alternatively, the trial court found that the seventh ground for postconviction relief failed as this court has previously held that Lindsey failed to meet the second prong of *Strickland v. Washington*, 466 U.S. 668, 687 (1984). (Nov. 30, 2018 Entry at 28.) The trial court set an evidentiary hearing for the remaining claims. (Nov. 30, 2018 Entry.)

{¶ 10} On September 29, 2022, the trial court held an evidentiary hearing at which the following evidence was adduced.

{¶ 11} Dr. Karla Fisher is an expert in domestic violence and victims of domestic violence. (Sept. 29, 2022 Tr. at 12.) In September 2015, Dr. Fisher wrote a report regarding her consultation and evaluation of Lindsey. (Tr. at 12, 23.) Dr. Fisher believed that domestic violence evaluations are helpful to provide "an understanding of the kinds of violence that a person has been through and how those changed how they see danger, and what they think they can do about it." (Tr. at 16.) Dr. Fisher believed the purpose of the evaluation was to determine if there was evidence of domestic violence and if so, how did the domestic violence affect Lindsey. (Tr. at 23.) Dr. Fisher reviewed the discovery documents, as well as additional documents collected by prior appellate counsel. (Tr. at 24.)[2] Dr. Fisher testified that Lindsey's records indicate an individual that may have been

---

[2] The parties stipulated to the authenticity and documents referenced in the report. (Tr. at 26.)

experiencing abuse at the time. (Tr. at 28.) Dr. Fisher had only recently considered correspondence between Lindsey and his counsel, but she did not find the letters impacted her evaluation. (Tr. at 29.) Dr. Fisher also reviewed Lindsey's essay about the moral culpability of murder as part of her evaluation. (Tr. at 30-31.) Dr. Fisher testified generally about her interview with Lindsey. (Tr. at 33.) During the evaluation, Dr. Fisher learned of purported examples of physical abuse such as L.B. forcing Lindsey to drink Ipecac, which induced vomiting. (Tr. at 37.) Dr. Fisher also described emotional abuse that she noted is prevalent in adult intimate relationships. (Tr. at 38.) Dr. Fisher recalled that, according to Lindsey, L.B. told him that she wished she had an abortion, that no one would want him as a partner, and that he was unworthy in various ways. (Tr. at 38.) Dr. Fisher also described several ways the mother isolated Lindsey, such as not letting him have friends over to the house. (Tr. at 39.) Dr. Fisher described "covert sexual abuse" where "a parent, sort of, turns their child into a partner but doesn't physically touch them." (Tr. at 39.) Dr. Fisher also recalled Lindsey's allegation that L.B. left him on an island during a cruise vacation forcing him to find his way back to the ship. Lindsey also claimed that L.B. left him at a homeless shelter at 17, 18 years old. (Tr. at 40.)

{¶ 12} Dr. Fisher concluded that Lindsey was battered by his mother, and that he was the victim of domestic violence. (Tr. at 41-42.) According to Dr. Fisher, Lindsey's experience with the fight or flight reaction is shaped by his history of violence. (Tr. at 43.) Dr. Fisher believed that Lindsey stabbing his mother multiple times is "not abnormal under the theory of domestic violence or a fight or flight syndrome." (Tr. at 44.) Dr. Fisher noted the physical disparity between Lindsey and his mother is not irrelevant but noted "people can control other people while being physically superior to them." (Tr. at 45.) Dr. Fisher provided examples where the child had grown up in the abuse or cases where the victim did not fight back out of fear of being arrested for domestic violence. (Tr. at 45-46.) Dr. Fisher cited the 2002 child abuse neglect investigation where L.B. left Lindsey on the side of a freeway. (Tr. at 46-47.) Based on available information, Dr. Fisher would have recommended a domestic violence evaluation in the case. (Tr. at 48.) Dr. Fisher would have recommended that Lindsey get a PTSD evaluation specifically to understand the severity of the symptoms and best treatment options. (Tr. at 49.) Dr. Fisher would also have testified as to myths associated with domestic violence victims. (Tr. at 51.)

{¶ 13} On cross-examination, Dr. Fisher conceded that her report is premised on Lindsey telling the truth throughout the interview. (Tr. at 53.) Dr. Fisher acknowledged that Lindsey did not report the type of abuse he provided to her during the previous competency evaluation. (Tr. at 56.) Dr. Fisher conceded that Lindsey's PTSD diagnosis came six months after his stay in the Ohio Department of Rehabilitation and Corrections after seeing an inmate stab another inmate. (Tr. at 56-57.) Dr. Fisher admitted that she did not include in her report that during Dr. Paul Goldstein's treatment, he had to warn a female nurse that Lindsey was becoming paranoid and obsessed with her and that he was worried about her safety. (Tr. at 57.) Regarding the freeway incident, Dr. Fisher agreed that the Children's Services records indicated the mother claimed she had pulled over to instruct Lindsey before he jumped out of the car. (Tr. at 58.) The report also indicated that the mother claimed that she went after him. (Tr. at 58-59.) The grandmother, based on Lindsey's impulsivity issues, believed L.B.'s account. (Tr. at 58.) Dr. Fisher conceded that she had not researched Ohio law on battered women's syndrome. (Tr. at 60.) Dr. Fisher also acknowledged that she included in her report that she "could have testified and prevented Robert from even having to take the stand." (Tr. at 60.) Dr. Fisher, however, was not familiar with the Supreme Court of Ohio case, which found that Lindsey would still have had to testify at trial. (Tr. at 60.)

{¶ 14} Dr. Fisher was aware of Lindsey's prior delinquency case where he assaulted a teacher. (Tr. at 61.) While that matter was pending, Lindsey was also charged with inducing panic. (Tr. at 61.) Dr. Fisher was aware that "as part of the inducing panic, for a period of about six months on four separate dates, Robert had put together a very realistic looking bomb and left threating notes at neighbor's residences." (Tr. at 62.) One such note read, "I will kill all of your family. I will cut off your dick. Cut off your head, and I will kill your little angels. I will cut her into a million pieces then I will cut of[f] your wife's vagina, cut of[f] your head and stick my dick into your decapitated head." (Tr. at 62.) Dr. Fisher also acknowledged Lindsey's multiple records of discipline for violating school rules. (Tr. at 64.) Dr. Fisher agreed that Lindsey throwing a pencil and a dead rat at a teacher constituted a violent offense. (Tr. at 64-65.) Dr. Fisher agreed that home schooling "would . . . not be a bad decision" knowing that if Lindsey continued getting into disciplinary action at school, it could be a probation violation. (Tr. at 67.) Dr. Fisher conceded that a parent

would be justifiably upset if their child continually gets expelled or arrested. (Tr. at 67-68.) Dr. Fisher acknowledged that as early as kindergarten, Lindsey's teachers and therapist noted ADHD and oppositional compliant behavior. (Tr. at 71.) Dr. Fisher was not aware that Lindsey turned down a flat 15-year term of incarceration if he pleaded guilty to manslaughter. (Tr. at 74.)

{¶ 15} Dr. Fisher was aware that Lindsey was found not guilty of aggravated murder, which requires premeditation. (Tr. at 75.) Dr. Fisher conceded that Lindsey's essay, written years before the death of L.B., talked about a child not being held responsible for the murder of a parent that was abusive for a long period of time. Dr. Fisher believed that there is a "possibility" the essay showed premeditation. (Tr. at 75-76.) Dr. Fisher stated that turning over the essay, as defense counsel believed would have been required if a battered child syndrome defense was pursued, would have "possibly" damaged the defense. (Tr. at 78.)

{¶ 16} Dr. Fisher agreed that it would be considered self-defense "if I am coming at you with knives in a rage and you have to fight me off and stab me." (Tr. at 76.) Dr. Fisher agreed that such facts would not warrant an expert witness to testify regarding self-defense. (Tr. at 77.) Dr. Fisher did not review any video footage from the police, observe the trial, or know whether Lindsey was "fidgety" or not during the trial. (Tr. at 77-78.)

{¶ 17} On re-direct examination, Dr. Fisher stated it is not surprising that Lindsey denied domestic violence or mental illness in this context. (Tr. at 83.) Dr. Fisher explained that there is often more than one trauma in someone's life that can result in PTSD especially if there is a chain of events. (Tr. at 87.)

{¶ 18} Brandon Shroy and Mark Collins represented Lindsey as trial counsel in this matter. (Tr. at 100.) According to Shroy, Lindsey's father referred the case to the firm and both attorneys were in the initial meeting with the father. (Tr. at 102.) Shroy noted that he was very involved in the case and served as the primary point of communication with Lindsey. (Tr. at 104-106.) According to Shroy, communication with Lindsey was very consistent with significant written correspondence. (Tr. at 105.) "[Lindsey] was easy to talk to in the beginning and pretty much stayed like that throughout. I didn't feel that he was particularly guarded." (Tr. at 105.) Collins was doing the "heavy lifting" with the legal side of the case. Shroy wanted to build a relationship with Lindsey to develop trust with the client. (Tr. at 108.) "I was more interacting with [Lindsey] and making sure he knew

everything going on." (Tr. at 108.) Shroy had concerns about Lindsey's mental health based on his juvenile history. (Tr. at 109.) Shroy recalled reading the report that Lindsey was competent and described as "maladaptive in his response to the world." (Tr. at 110.) Shroy testified to various letters sent to, and received by, Lindsey. (Tr. at 111.) With permission from Lindsey, Shroy sent the prosecutor in the case a letter from his client saying that he would not accept the plea offer. (Tr. at 113.) Shroy intended to put on the record that he was "advising [Lindsey] to take the plea." (Tr. at 113.) Shroy also testified to one of Lindsey's letters that included "the words spirits, so[ul], spirituality and probably ten other words in here and it looks like it's ripped out of a small dictionary." (Tr. at 115.) Another letter Lindsey sent had no writing but looked to have "smeared blood on it." (Tr. at 116.) "I remember making anybody who would listen aware there is more going on here, there's a juvenile history that is troubling and it seemed linear with deteriorating behavior." (Tr. at 119.)

{¶ 19} On cross-examination, Shroy explained that the self-defense defense originated from Lindsey's statements to the first responders and during the police interview. (Tr. at 117, 121.) Shroy considered the battered child syndrome defense, which was part of the reason they requested competency and NGRI evaluations. (Tr. at 122.) Shroy believed that he met with Lindsey 13 times at the jail over the course of 15 months. (Tr. at 123.) Shroy also met with Lindsey before and after each of the 11 pretrial hearings. (Tr. at 123.) Shroy indicated that Lindsey was one of the clients he has interacted with the most in his career. (Tr. at 124.)

{¶ 20} Regarding why counsel did not pursue battered child syndrome as a defense, Shroy testified:

> Because there is always multiple things going when you present to a jury, and one of them is what the doctors might say and one of them is going to be the perception of the jurors. And the allegations of abuse that I was hearing about, I thought would play very poorly with the jury on balance with what they were going to hear his actions were. And so from a purely trial strategy standpoint, it didn't seem prudent if the doctor's were convinced that this would be a nonintuitive, but explainable reaction, then I would have said that is why they are doctors and I'm a lawyer, and I would have thought maybe it makes sense to use it. But given what we were getting from feedback from the professionals, it didn't seem like that would either, one, play well, or two, be validated by what the doctors were saying.

(Tr. at 124.)

{¶ 21} Shroy believed that self-defense was not just a better trial strategy, but "it was playing the hand we were dealt. It was what he explained it as, and while I don't think that is mutually exclusive with him being mentally ill, it's the words that came out of his mouth and what he wanted to pursue . . . this is what he said happened." (Tr. at 125.) According to Shroy:

> It occurred to me that not everything that wouldn't be normal would necessarily stick out in his mind so I tried to explore those things. And as he and I went through specific things, he directed me to go to the condo where he had lived. He asked me to find things that I did. He and I talked about those things. So when I say more client contact, I've also never worked in the capacity of an investigator or going to somebody's home or crime scene. That's -- that's happened maybe three times or so in my defense career. But I got all of the information that he told me was out there and I listened to what he had to say, and as I listened to those things, that's the conclusion I came [up] with.

 (Tr. at 126.)

{¶ 22} At Lindsey's request, Shroy collected items from the house, which included a small safe that contained a picture Lindsey had taken of his bruise from L.B. (Tr. at 127.) Shroy also found an essay titled, "Innocents by Nature." (Tr. at 128.) The essay discussed whether a child should be held responsible for murdering an abusive parent. In the essay, Lindsey wrote "[i]f the child was sexually or physically abused especially on a regular bas[i]s or the child attempted to reach out to someone for help and the murder was a direct result of self-defense the child should not be held criminally or civilly responsible." (State's Ex. 4.) According to Shroy, the "letter looks like prior calculation and design from three years before I ever interacted with [Lindsey]." (Tr. at 128.) The essay triggered Crim.R. 16 questions, and Shroy was concerned that if they pursued a battered child syndrome defense that he would have to disclose the essay. (Tr. at 129.)

{¶ 23} Shroy believed a battered child defense "would play out really poorly in front of a jury considering the abuse that we could document" and the essay would paint him in a bad light. (Tr. at 129.) Shroy also stated that if they claimed battered child syndrome, the state would have the right to do an evaluation on Lindsey, which raised concerns. (Tr. at 129.) "[My] primary concern was if I go down the road too much of talking about battered child, knowing that I have in my possession this . . . if they started asking questions and that

sort of thing came up, that that would be problematic because then there would be documentation and a report that could potentially paint in him a . . . really bad light." (Tr. at 129-130.)

{¶ 24} The sexual abuse allegations came up in the context of Lindsey's juvenile case. (Tr. at 145.) "[T]he county prosecutor's office had a juvenile prosecutor who later heard [Lindsey] was prosecuted and reported back from their perception that the relationship appeared inappropriately close in the hall. I didn't know what that meant. But it sort of grew into, that is something we needed to explore as much as we can, to the extent I actually asked him why would they say that, and then talked about it to see if he could give me some context." (Tr. at 145.) While Shroy noted that he had heard there were rumors that Lindsey was "molested," but counsel found nothing to corroborate that claim. (Tr. at 131.) Lindsey denied any sexual abuse. "I was prompting him towards that direction, because to me that would have been a game changer and so I was trying to explore it. But doing this kind of work, I have to be sensitive to not putting words into people's mouth. I am not going to tell you what an ideal defense would be." (Tr. at 132-133.) Lindsey dismissed questions about sexual abuse as Shroy believed "[i]t didn't seem like there was anything there. I couldn't go further in exploring it without feeling like I was just telling him, here is what you should say." (Tr. at 133.)

{¶ 25} Shroy characterized his efforts to get Lindsey to accept the plea agreement as going "beyond recommending. I spent the rest of the time, I interacted with Robert trying to figure out why he wasn't accepting that." (Tr. at 130.) According to Shroy, Lindsey always insisted that he would testify. "It was never a doubt." (Tr. at 134.) "That is one of the very few decisions that he gets to make and I can't overrule him on when he said I am testifying and this is what he was going to testify to." (Tr. at 134-135.) According to Shroy, Lindsey's testimony at trial was more focused than he expected, and he "didn't seem particularly nervous." (Tr. at 135.) "He felt like he had his story to tell and he was going to tell it." (Tr. at 135.)

{¶ 26} Robert Lindsey III is the biological father of Lindsey. (Tr. at 150.) The father observed L.B. use physical violence to discipline Lindsey. (Tr. at 153.) The father believed the discipline was "over the top." (Tr. at 154.) According to the father, when Lindsey became eight or nine, he was cut off from visitation after they broke off the relationship.

(Tr. at 155.)  The father was generally not included in discussions about Lindsey's mental health and had limited involvement in school.  (Tr. at 158-159.)  The father assisted Lindsey in obtaining legal counsel and retained Shroy and Collins in the case.  (Tr. at 161.)  While the father did not believe Lindsey was being entirely forthcoming with counsel, he did not talk to the attorneys about it.  (Tr. at 166.)

{¶ 27}  On cross-examination, the father stated that he visited Lindsey in jail twice a week.  (Tr. at 167.)  At some point, the guardian ad litem informed him that Lindsey did not want to see him.  (Tr. at 168.)

{¶ 28}  Collins was lead trial counsel for Lindsey in this case.  (Tr. at 172.)  Collins recalled that Shroy discovered the essay while at Lindsey's residence.  (Tr. at 179; State's Ex. 4.).  Collins spoke with Lindsey's prior appellate counsel and cited the essay as one of the reasons for the trial strategy.  "[T]hat is the first time I ever made anyone aware of it." (Tr. at 180.)  "[T]he evidence was clear that Robert was putting forth a self-defense [defense] when he was interviewed by the police."  (Tr. at 181.)  Collins recalled that Lindsey alleged that his mother was physically abusive and documented the abuse in a picture of a bruise, which was the reason Shroy went to the residence.  (Tr. at 181.)  Collins heard claims that there was an odd relationship between Lindsey and his mother that was characterized as "too close, one of a sexual nature."  (Tr. at 182-183.) There was even a rumor that Lindsey might have impregnated L.B.  (Tr. at 183.)  Regarding the abuse allegations, Collins stated:

> [W]hen we pushed [Lindsey] about examples of -- and I don't mean push in a negative way, just prodded and formed about examples of discipling, examples of that, it wasn't adding up to what he was alleging. When we would try to approach the topic of a sexual nature, he would get frustrated and kind of lose his temper with . . . us.

(Tr. at 185.)

{¶ 29}  Collins sought "a full psychological workup," because Lindsey had "some . . . mental health aspects he is exhibiting, some of the school records, you know, other aspects of that.  So in that situation, the real reason I am asking for it is because I believe there is something sexual between he and his mother.  I -- each time I met with him, I felt he was holding back from me."  (Tr. at 188.)  Closer to trial, Collins started receiving letters from Lindsey about the devil and "numbers adding up to things."  (Tr. at 185.)  In one letter, Lindsey "allegedly cut himself and put it on paper and sent it to us."  (Tr. at 197.)  With

permission, Collins released the letters to the prosecution. "So I said, This is what I am dealing with on these issues." (Tr. at 185.) Collins did not receive the juvenile records in discovery but received part of the custody records. (Tr. at 186-187.) Collins reviewed about "700 pages of the school records." (Tr. at 186.) Collins encouraged Lindsey to be truthful to other professionals. (Tr. at 190.) Collins recalled Dr. Jaime Lai's report that indicated competency and no NGRI. (Tr. at 190.) Collins asked professionals who were doing the exams to "push" Lindsey on whether there was a sexual relationship between him and mother, and "[e]ach time the exam was done, I would get the results" that "there [was] nothing there. Nothing in there about the sexual history, nothing about any abuse, nothing about anything." (Tr. at 191.) When Collins followed up with the professionals, they stated that they did, in fact, ask about sexual history and abuse. (Tr. at 191.)

> Everything I read from the NGRI, the competency was consistent with what I read from the psychological he had in 2000, the three or four psychologicals I read through counselors, the school psychologist that did the psych a year or two prior to this, so everything in there talks about impulsive behavior, talks about -- I forget the terms and stuff, but it all lined up the same way. There was nothing new that we had thought -- that we had read before, any of those psychs I reviewed, and I think there were three or four of them, I'm not sure. There was nothing from those psychs that was different from those, the new full workup that we had.

 (Tr. at 191-192.)

{¶ 30} Collins recalled Lindsey alleging three incidents of abuse: (1) L.B. left him on the side of the freeway, (2) L.B. stabbed him with a fork, and (3) L.B. hit him with a coat hanger leaving a bruise. (Tr. at 192-193.) After reviewing various school and counseling records, there was nothing regarding allegations of physical abuse. (Tr. at 193.) Lindsey would say "there was [a] history of abuse, but there was no record of it." (Tr. at 194.) In fact, Collins claimed L.B. was often very present for Lindsey. "Every time [Lindsey] would act out or there would be an issue at school or somewhere, his mother would come and save the day, go to bat so to speak, and you would see quotes in there basically saying, I can't believe the level of maternal care that the mom gives [Lindsey]." (Tr. at 193.) [3]

---

[3] (*See also* Tr. at 217 ("I've never seen a mother try as hard as she did at least in terms of going to the things, asking for teams, asking for help, asking for assessments, and then you go to -- you look at the teacher's reports and stuff like that.").)

{¶ 31} Collins believed it was in Lindsey's best interest to take the offer from the state. (Tr. at 214.) "I think I could have gotten 12 or 13 flat. But to -- to try to convince a jury . . . of self-defense is a very difficult task when it's your mother." (Tr. at 214-215.) According to Collins, the prosecutor told him that "if you get [Lindsey] to 12 or 13, I will do my best to resolve the case." (Tr. at 199.) Lindsey refused to agree to those numbers. (Tr. at 199.) Collins explained his actions of sending the letters to the prosecutor as follows:

> [W]e were desperately trying to get [Lindsey] to take the plea. We believed it was in his best interest. We believed all those types of things, and so many times in the criminal world and you go to trial, you either win, lose, or something in between, and then the client comes back and says, that offer was never made to me. So that was my attempt of saying I need this, I'm letting you know this is our -- this is why we want to resolve the case. I want to put all of that on the record in front of the Judge.

 (Tr. at 201-202.)

{¶ 32} On cross-examination, Collins recalled that trial counsel visited Lindsey 13 times over the course of 15 months. (Tr. at 205.) Trial counsel also met with Lindsey before and after each of the 11 pre-trial hearings. (Tr. at 206.) During the life of the case, Lindsey sent Collins 31 letters. (Tr. at 197.) Collins also sent Lindsey 30 or 32 letters documenting various things in the case. (Tr. at 206.) Collins testified that he spent more time with Lindsey than any other client during his 30 years in the criminal justice system. (Tr. at 206.)

{¶ 33} According to Collins, the difficulty of Lindey's self-defense defense started with Lindsey's own statements. "[T]he minute the police were there, [Lindsey] started the self-defense line -- of answers and questions and then were questions that -- answers that were just not good for him. And we -- we have five or six-page outline typed for him that what were the difficulties or negatives of your case and we went over that with him line by line." (Tr. at 208.)

{¶ 34} Collins expounded on the difficulties in the trial strategy as follows:

> On that day in school I believe he came home, he had a normal day, mom needed to borrow his phone, mom saw something on his phone, they had an argument about it, mom took his phone away, he wasn't happy, and then all of a sudden, you know, he said mom came in with two knives, okay, and came at me. And then the next thing is he goes, I kept a knife under my pillow. Okay. So that whole concept is a hard process to prove beyond a

preponderance of that he didn't create the situation or who created the situation.

(Tr. at 209.)

{¶ 35} Collins also believed that the amount of force used was problematic. (Tr. at 209.) Lindsey "had a small puncture wound in his thigh that many people would argue it was self inflicted." (Tr. at 209.) Conversely, Collins noted the seven individual stab wounds to L.B. (Tr. at 210.) "That's why we asked people, we researched things. Hey, what can we do to see if there was anything else out there with [Lindsey]. That is why we pushed him and said, Please talk to the mental health professionals, give us something. So the trial strategy we had moved to self-defense because there was no other history of physical abuse, no other history of sexual abuse." (Tr. at 210.) Regarding the battered child syndrome defense, Collins believed there was not enough evidence based on the alleged incidents. "I got -- my mother forked me when I was four, I have a bruise at some point in my teenage years, and she was very strict with me, and that is all we had." (Tr. at 213.) "There was nothing there to do a viable trial strategy." (Tr. at 213.)

{¶ 36} Collins recalled asking Lindsey about the sexual abuse, and he "[a]damantly denied anything about it." (Tr. at 218.) Collins did not believe Lindsey would present well if they employed a battered child defense. (Tr. at 222.) Regarding whether to have an expert examine Lindsey for battered child syndrome, Collins stated:

> I had concerns because nothing changed from every single psychological or evaluation he ever had. Nothing came out. Nothing was there. That is why I pushed to have the full psych done. So in that situation, there was no evidence to back that up.

(Tr. at 221.)

{¶ 37} Collins believed the essay could be read as evidence of "prior calculation." (Tr. at 211-212.) Collins recalled that his administrative assistant's daughters both knew Lindsey, which he believed provided some insight. (Tr. at 213-214.) Collins testified that "everything they said was, mom is strict, it's a different relationship, but no, I don't think there is a sexual relationship. No I don't think -- so any time we went down that avenue, we didn't get anywhere." (Tr. at 214.) Collins also looked at Lindsey's school psychological exam from the previous year, which included only that he had "impulsive behavior." (Tr.

at 216.) There was also a neurological examination and school records, which showed Lindsey was bullying a girl. (Tr. at 216.)

{¶ 38} Collins wrote a letter to Lindsey, marked State's Exhibit 7D, that discussed the parole board and realities of a life tail in a sentence. (Tr. at 227.) "It was actually [] life to 20. No one ever gets released to their first time, yeah, that's the letter." (Tr. at 228.) When the jury was selected, Collins conveyed the prosecutor's final offer of 15 years, which Lindsey rejected. (Tr. at 228-229.) After the hearing, the parties stipulated to various exhibits as well as the affidavits of Jefferson Liston and Jan Maloney.

{¶ 39} On August 31, 2023, the trial court denied the remaining grounds for relief finding "defendant fails to show any ineffective assistance of counsel on grounds one through four." (Aug. 31, 2023 Findings of Fact and Conclusions of Law Den. Relief on Am. Postconviction Petition at 33.)

{¶ 40} Lindsey filed a timely appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 41} Appellant assigns the following as trial court error:

> [1.] The trial court abused its discretion by denying Mr. Lindsey's first, second, third, and fourth grounds for postconviction relief.

> [2.] The trial court abused its discretion by denying Mr. Lindsey's seventh ground for postconviction relief without an evidentiary hearing.

## II. STANDARD OF REVIEW

{¶ 42} A petitioner is afforded a statutory avenue to seek postconviction relief under R.C. 2953.21. "Postconviction relief is a means to reach constitutional issues which would otherwise be impossible to reach because the evidence supporting those issues is not contained in the record." (Further citation and quotation omitted.) *State v. Rutan*, 2024-Ohio-593, ¶ 4 (10th Dist.). To succeed in a petition for postconviction relief, a petitioner must demonstrate a violation of his or her constitutional rights, which renders the judgment of conviction void or voidable. *State v. Jackson*, 2024-Ohio-2091, ¶ 25 (2d Dist.), citing R.C. 2953.21(A)(1)(a)(i). The Supreme Court in *State v. Bunch*, 2022-Ohio-4723 addressed the standard a trial court must utilize when resolving whether to hold a hearing on a timely postconviction petition. *Bunch* at ¶ 22. The *Bunch* court highlighted the

distinction between the petitioner's burden to receive a hearing on a petition for postconviction relief and the standard for ultimately granting relief on the petition. *Bunch* at ¶ 22. To warrant a hearing, the petitioner must merely establish "whether there are substantive grounds for relief." R.C. 2953.21(D). When "determining whether the petition states a substantive ground for relief, the trial court must consider the entirety of the record from the trial proceedings as well as any evidence filed by the parties in postconviction proceedings." *Bunch* at ¶ 24, citing R.C. 2953.21(D). The petitioner demonstrates substantive grounds for relief "[i]f the petition is sufficient on its face to raise an issue that the petitioner's conviction is void or voidable on constitutional grounds, and the claim is one which depends upon factual allegations that cannot be determined by examination of the files and records of the case." (Internal citation and quotation omitted.) *Bunch* at ¶ 23. However, "[i]f the record on its face demonstrates that the petitioner is not entitled to relief, then the trial court must dismiss the petition." *Id.* at ¶ 24, citing R.C. 2953.21(D) and (E).

{¶ 43} After a hearing, in order to demonstrate that trial counsel was ineffective, courts must determine if the petitioner established that counsel's performance was (1) deficient and (2) that the deficient performance prejudiced the petitioner. *Bunch* at ¶ 26, citing *Strickland*, 466 U.S. at 687. When determining whether counsel was deficient, courts "[ask] whether the attorney's conduct 'fell below an objective standard of reasonableness.' " *State v. Lloyd*, 2022-Ohio-4259, ¶ 16, quoting *Strickland* at 688. "The reasonableness of the attorney's conduct must be judged based on 'the facts of the particular case, viewed as of the time of counsel's conduct.'. . . Only when the attorney's errors were 'so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment' has the attorney engaged in deficient performance." *Lloyd* at ¶ 16, quoting *Strickland* at 687, 690.

{¶ 44} Indeed, representation of a criminal defendant requires counsel to fulfill certain basic duties. *Strickland* at 688. Relevant to the instant appeal, one such duty is the duty to make "reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland* at 691. In any ineffectiveness case, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* When considering the first prong of *Strickland*, "[j]udicial scrutiny of counsel's performance must

be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland* at 689. As such, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (Quotation omitted.) *Id.* Courts assessing the reasonableness of counsel's investigation "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith,* 539 U.S. 510, 527 (2003). To be sure, " 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " *Wiggins* at 521, quoting *Strickland* at 690.

{¶ 45} As for the prejudice prong, the petitioner must prove that there is a "reasonable probability" that counsel's deficiency affected the outcome of the petitioner's proceedings. *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* When a petitioner challenges their conviction, the question becomes whether there is a reasonable probability that, but for the errors, the fact finder would have had a reasonable doubt respecting guilt. *Bunch* at ¶ 26, citing *Strickland* at 695.

{¶ 46} We review the trial court's denial of a petition for postconviction relief after an evidentiary hearing for an abuse of discretion. *Bunch* at ¶ 25, citing *State v. White*, 2008-Ohio-1623, ¶ 45. Appellate courts will not reverse a trial court's judgment for an abuse of discretion unless the decision is unreasonable, arbitrary, or unconscionable. *State v. Foster*, 2024-Ohio-2924, ¶ 61 (10th Dist.), citing *State v. Wade*, 2021-Ohio-4090, ¶ 9 (10th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

## III. LEGAL ANALYSIS

{¶ 47} On appeal, Lindsey has asserted two assignments of error related to five of the seven grounds for postconviction relief raised with the trial court. In each of the five relevant grounds for relief, Lindsey claimed that his "convictions and sentences are void and/or voidable because he was denied the effective assistance of counsel to which he was entitled under the Sixth and Fourteenth Amendments." (Feb. 5, 2016 Am. Petition to

Vacate & Set Aside Jgmt. at 47, 50, 53, 55, 56, 63.)  In relevant part, grounds one through four, and ground seven are as follows:

1. Robert's trial counsel failed to investigate the impact of domestic violence (known, in legal terminology, as "battered woman's (person or child) syndrome") on Robert's self-defense defense, apply for or obtain expert assistance to explore those issues, or consult with an expert on domestic violence in preparation for trial.

2. Robert's trial counsel failed to present expert testimony on battering (domestic violence) and its effects at trial.

3. Robert's trial counsel failed to correct or counter the prosecution's repeated exploitation of myths and misconceptions about battering and its effects on the abused youth (Robert).

4. Robert's trial counsel failed to investigate, including speaking to witnesses and obtaining documents, to support Robert's testimony that he had been abused by his mother, [L.B.], and that she was the likely aggressor; and failing to present this evidence at trial.

7. Robert's trial counsel failed to request the "no duty to retreat" jury instruction and/or object to the trial court's failure to provide the "no duty to retreat instruction" to the jury.

(Feb. 5, 2016 Am. Petition to Vacate & Set Aside Jgmt. at 47, 50, 53, 55, 56, 63.)

### A. Appellant's First Assignment of Error

{¶ 48}  In Lindsey's first assignment of error, he contends that the trial court erred by denying grounds one through four for postconviction relief after a hearing.  Because these grounds for relief are intertwined, we will address them together.

### 1. Investigation

{¶ 49}  Lindsey's argument focuses on alleged deficiencies in counsel's pre-trial investigation in the case.  Specifically, Lindsey contends that counsel discovered "several discrete examples of past domestic abuse [by L.B.]" as well as rumors of sexual abuse. (Appellant's Brief at 32.)  According to Lindsey, "Collins and Shroy failed, however, to develop a comprehensive understanding of Mr. Lindsey's past abuse or the impact the abuse had on him.  That evidence was discovered only through Mr. Lindsey's postconviction investigation." (Appellant's Brief at 32.)

{¶ 50} Shroy and Collins testified at length regarding their investigation in this case. Extensive testimony was devoted to the volume of communication between Lindsey and his trial attorneys. Shroy and Collins testified that they met with Lindsey 13 times at the jail over the course of 15 months. (Tr. at 123, 205.) Prior to the jury trial, the attorneys also met with Lindsey before and after each of the 11 hearings. (Tr. at 123, 206.) According to Shroy, their communication with Lindsey was very consistent throughout the case with significant written correspondence. (Tr. at 105.) Collins believed that they sent Lindsey 30 or 32 letters documenting various things. (Tr. at 206.) Both Shroy and Collins indicated that Lindsey was one of the clients they had interacted with the most in their careers. (Tr. at 124, 206.)

{¶ 51} In addition to both in person and written communications with Lindsey, Shroy and Collins reviewed numerous records in the investigative phase of the case including part of the Children's Services records, counseling records, and psychological records. (Tr. at 186-187, 193, 216.) Collins also reviewed about "700 pages of the school records." (Tr. at 186.) Collins did not receive the juvenile records in discovery and only part of the custody records.

{¶ 52} After reviewing the records, Collins concluded that there was nothing documented regarding allegations of physical abuse. (Tr. at 193-194.)[4] In fact, Collins recalled that L.B. attended every hearing, every expulsion, or court hearing. (Tr. at 194.) "Every time [Lindsey] would act out or there would be an issue at school or somewhere, his mother would come and save the day." (Tr. at 193.)

{¶ 53} As part of their investigation, Shroy and Collins also made various inquiries into the alleged sexual abuse. Collins spoke with Lindsey's prior counsel in his delinquency proceedings, Liston, and the state's victim's advocate regarding Lindsey and his mother's interactions. (Tr. at 181-182.) While Lindsey's prior counsel indicated that there was "something odd" about the relationship between Lindsey and L.B., Lindsey denied any sexual abuse and none of the claims could be substantiated. (Tr. at 181, 182.) Furthermore, when Collins spoke with his administrative assistant's daughters who knew Lindsey from

---

[4] As set forth below, while the Children's Services records documented the "freeway incident," which resulted in the mother temporarily losing custody, there were competing accounts as to whether L.B. kicked Lindsey out of the car or whether Lindsey jumped out of the car on his own volition.

school, they did not believe there was a sexual relationship between Lindsey and his mother. (Tr. at 213-214.)

{¶ 54} Counsel described their repeated efforts to have Lindsey disclose any and all abuse by L.B., sexual or otherwise, as part of the investigation. Shroy "prompt[ed] [Lindsey] towards that direction, because to me that would have been a game changer and so I was trying to explore it. But doing this kind of work, I have to be sensitive to not putting words into people's mouth." (Tr. at 132-133.) When counsel asked Lindsey about sexual abuse, Lindsey adamantly denied anything occurred. "[N]othing, nothing, nothing, adamant nothing, nothing sexual, adamant nothing there. So there was nothing there to present a defense or trial strategy in those regards." (Tr. at 212.) In addition to denying sexual abuse claims, when Collins would raise the topic of sexual abuse, Lindsey "would get frustrated and kind of lose his temper with . . . us." (Tr. at 185.) Ultimately, Shroy and Collins abandoned the investigation toward sexual abuse because they "couldn't go further in exploring it without feeling like [they were] just telling him, here is what you should say." (Tr. at 133.)

{¶ 55} Throughout the course of their investigation, Shroy and Collins were able to get Lindsey to describe three instances of abuse. According to Lindsey, L.B. (1) left him on the side of the freeway, (2) stabbed him with a fork, and (3) hit him with a coat hanger leaving a bruise. (Tr. at 192-193.) When Collins asked about further instances of mental, physical, or other types of abuse, Lindsey would provide the same examples each time. (Tr. at 216.) If Collins would ask about additional examples of abuse, Lindsey would talk about a chore chart and how if he did not do his chores, he would get disciplined. (Tr. at 215-216.) The discipline would include not going to a dance or having his phone taken away. (Tr. at 215.)

{¶ 56} During the pre-trial investigation, Lindsey failed to give his attorneys sufficient examples beyond the three aforementioned incidents of "mental, physical or other types of abuse." (Tr. at 215, 216.) Shroy explained that the self-defense defense originated from Lindsey's statements to first responders and during the interview with law enforcement. (Tr. at 121.) Shroy believed a battered child defense "would play out really poorly in front of a jury considering the abuse that we could document" and the essay would paint him in a bad light. (Tr. at 129.) "[M]y primary concern was if I go down the road too

much of talking about battered child, knowing that I have in my possession this . . . if they started asking questions and that sort of thing came up, that would be problematic because then there would be documentation and a report that could potentially paint in him a . . . really bad light." (Tr. at 129-130.) After reviewing numerous records and conducting various interviews, Shroy and Collins decided that self-defense would be their best trial strategy and further investigation into additional instances of abuse and application of the battered child defense was not warranted. Upon review, we find the trial court's conclusion that counsel's investigation was not deficient in this case was reasonable and not an abuse of discretion.

{¶ 57} Lindsey argues that counsel should have done more in their investigation. Namely, counsel should have (1) obtained the Children's Services investigation report; (2) spoke "to Mr. Lindsey's juvenile probation officer" in order to corroborate Lindsey's "account of the past abuse he had suffered"; and (3) consult "with a domestic-violence expert like Dr. Fischer" who "would have been able to provide insight into how Mr. Lindsey perceived [L.B.] and how that perception shaped his behavior on the night that he killed her." (Appellant's Brief at 33-34.)

{¶ 58} Concerning the Children's Services records, Collins testified that he reviewed parts of the records and knew that L.B. temporarily lost custody of Lindsey at some point. (Tr. at 187.) Moreover, we know that Lindsey disclosed his account of the freeway incident to counsel, which would be in the records. (Tr. at 192.) From the testimony at the hearing, we can glean that L.B. claimed that she went after Lindsey. (Tr. at 58-59.) The grandmother, based on Lindsey's impulsivity issues, believed L.B.'s account. (Tr. at 58.)

{¶ 59} Lindsey's claim that the records would have "corroborated" Lindsey's account of the past abuse is unavailing. Counsel may " 'formulate a strategy that was *reasonable at the time* and to balance limited resources in accord with effective trial tactics and strategies.' " (Emphasis added.) *State v. Vanpernis*, 2025-Ohio-365, ¶ 30 (4th Dist.), quoting *Harrington v. Richter*, 562 U.S. 86, 107 (2011). Here, counsel did not dispute Lindsey's account or that additional instances of abuse were not relevant. Quite the opposite. The issue was Lindsey did not disclose any type of abuse beyond the three incidents. As there is no claim that the records documented instances of abuse beyond what counsel already knew at the time, we find counsel's determination not to seek out the

complete Children's Services records, in conjunction with counsel's review of hundreds of pages of school records and counselor records, a reasonable one. (Tr. at 186.)

{¶ 60} Regarding Lindsey's claim that trial counsel should have spoken with Lindsey's juvenile probation officer, we find, given counsel's discussion with Liston and the victim advocate, they were able to glean sufficient insight into the relationship concerning the delinquency matter. While Maloney's affidavit noted concerns about the dynamic between Lindsey and L.B., counsel was already aware of the unusual relationship that led to the allegations of sexual abuse. While Liston and Maloney noted difficulties with L.B.'s behavior during their interactions, neither reported any abuse, despite being mandatory reporters, or, at least concerning Maloney, sought alternative placement for Lindsey. (Oct. 21, 2022 Liston Aff. at ¶ 7; Oct. 21, 2022 Maloney Aff. at ¶ 11.) As such, Lindsey fails to demonstrate what, if any, corroborative value counsel would have gained from speaking with the juvenile probation officer.

{¶ 61} Lindsey's most developed argument concerns trial counsel's decision during the investigation to not consult with a domestic violence expert. (Appellant's Brief at 34.) According to Lindsey, "a domestic-violence expert would have been able to provide insight into how Mr. Lindsey perceived his mother and how that perception shaped his behavior on the night that he killed her." (Appellant's Brief at 34.)

{¶ 62} *Strickland* provides that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements and actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland* 466 U.S. at 691. As set forth previously, after investigating the matter, counsel determined that a self-defense defense based on the events immediately before the incident was the best strategy and further investigation into the abuse was not prudent. Counsel reached this decision after significant time probing Lindsey about prior abuse, review of various records, and consultation with medical professionals. Counsel explained that they ceased further investigation based on the lack of alleged instances of abuse. "I got -- my mother forked me when I was four, I have a bruise at some point in my teenage years, and she was very strict with me, and that is all we had." (Tr. at 213.) "There was nothing there to do a viable trial strategy." (Tr. at 213.)

{¶ 63} There is no doubt that Dr. Fisher identified several instances of alleged abuse that Lindsey disclosed to her as part of her evaluation. Dr. Fisher acknowledged, however, that her analysis was based on Lindsey telling the truth about the allegations. Even if these claims were accurate, Dr. Fisher also conceded that Lindsey did not report that type of abuse during the evaluations. (Tr. at 55-56.) "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland* at 691. "Everything [Collins] read from the NGRI, the competency was consistent with what I read from the psychologicals he had in 2000, the three or four psychologicals I read through counselors, the school psychologist that did the psych a year or two prior to this, so everything in there talks about impulsive behavior. . . . There was nothing from those psychs that was different from those, the new full workup that we had." (Tr. at 191-192.) Every time counsel reviewed records, the conclusion was generally the same. Based on Lindsey's limited accounts of abuse prior to trial, counsel concluded that further investigation into the abuse, or consultation with a domestic-violence expert, was not warranted. (Tr. at 125, 215-217.)

{¶ 64} To be sure, there are instances where, despite evidence of abuse, a defendant refuses to discuss certain topics. In such cases, counsel's actions could potentially be deficient if they abandon the investigation because the client was "fatalistic or uncooperative." *Porter v. McCollum*, 558 U.S. 30, 40 (2009). The record, however, indicates Lindsey had no difficulty discussing L.B.'s abuse. According to Shroy, "[Lindsey] was easy to talk to in the beginning and pretty much stayed like that throughout. I didn't feel that he was particularly guarded." (Tr. at 105.) Despite repeated efforts by counsel to identify instances of abuse, Lindsey provided the same three allegations. Other professionals, whether in older records or Dr. Lai's evaluation, reported the same result. Most notably, Dr. Lai wrote, "[Lindsey] put forth a great deal of effort to present himself in a positive light. . . [Lindsey] spontaneously offered information about past incidents in which he portrayed himself as a 'victim' at home and at school." (Ex. B., Evaluation of Robert Lindsey at 12.) Based on the available information, it is reasonable that counsel concluded that further investigation would not yield new information and detract from their case.

{¶ 65} Lindsey contends that Shroy and Collins failed to "explain how Mr. Lindsey came to engage in a life-or-death struggle with his mother, why Mr. Lindsey was so afraid of her, or why he stabbed her seve[ral] times." (Appellant's Brief at 33.) Lindsey's first statement after the incident, which he maintained through trial, is that L.B. attacked him with two knives. True, "[w]ithout expert testimony, a trier of fact may not be able to understand that the defendant at the time of the killing could have had an honest belief that he was in imminent danger of death or great bodily harm. Further, it is difficult for the average person to understand the degree of helplessness an abused child may feel." *State v. Nemeth*, 82 Ohio St.3d 202, 208 (1998). As acknowledged by Dr. Fisher, however, an expert is not necessary to explain self-defense from someone "coming at you with knives in a rage" and that a jury could use its common sense. (Tr. at 76-77.) While Lindsey also argues an expert would provide insight into Lindsey's behavior that night, a juror is capable of determining whether Lindsey felt force was required to combat L.B.'s attack. *See, e.g., State v. Sallie*, 81 Ohio St.3d 673, 676 (1998) (finding that the issue of whether being threatened with death required the use of force was within the understanding of the jury.)

{¶ 66} In addition to Lindsey's consistent claim that he used self-defense because L.B. attacked him with two knives, Dr. Lai's report is telling as to Lindsey's true intention for disclosing L.B.'s history of abuse.

> [Lindsey] explained that at the time he was interviewed by detectives he believed his mother was still alive and 'would feed them all kinds of lies.' He reported telling the detectives about the abuse in order to 'ensure that I wasn't going to be screwed over.'

(Sic Passim.) (Ex. B., Evaluation of Robert Lindsey at 17.)

{¶ 67} In fact, Lindsey's statements to law enforcement about the abuse, which were played at trial, indicates that he was "kind of over" the fork incident, which he stated was "in the moment kind of thing." (July 9, 2014 Tr. Vol. 2 at 175.) As such, it was reasonable for Shroy and Collins to believe that a domestic violence expert was unwarranted.

{¶ 68} Lindsey takes issue with the trial court's reliance on Dr. Lai's competency and insanity evaluations. (Appellant's Brief at 37.) Lindsey contends that Dr. Lai's report, in fact, provided additional evidence warranting further investigation. (Appellant's Brief at 37-38.) During the hearing, Shroy described concerns about mental illness with Lindsey based on his juvenile history. (Sept. 29, 2022 Tr. at 109.) Shroy and Collins also testified

to receiving concerning letters from Lindsey during the case. Despite Collins desire for Dr. Lai to ask Lindsey about any potential sexual abuse, Dr. Lai was assessing for Lindsey's current mental condition as well as his capacity to understand the legal proceedings and assist counsel in his own defense.

{¶ 69} In addition to the due diligence into the competency and NGRI issues, Collins asked Dr. Lai to "push" Lindsey on whether there was a sexual relationship between him and mother, and "[e]ach time the exam was done, I would get the results" that "there [was] nothing there. Nothing in there about the sexual history, nothing about any abuse, nothing about anything." (Tr. at 191.) The report of incidents of abuse was "consistent with statements he made to detectives at the time of his arrest." (Ex. B., Evaluation of Robert Lindsey at 4.) While Lindsey is correct to an extent that the competency and insanity examinations are not equivalent of consulting with a domestic violence expert, Shroy and Collins testified that they used the test as an opportunity to have a physician attempt to flesh out any further abuse that their client had declined to share during their investigation. Lindsey, again, did not disclose additional instances of abuse. According to Shroy, "[he] tried pretty hard to explore it and I just couldn't find anything. Nothing came back from the doctors. I didn't think there was anything else going on." (Tr. at 145.)

{¶ 70} It is evident that the essay played a major role in counsel's trial strategy. Shroy believed the essay "look[ed] like prior calculation and design from three years before [he] ever interacted with [Lindsey]." (Tr. at 128.) According to Shroy, the essay triggered Crim.R. 16 questions and that it could have been a "discoverable paper depending on which trial strategy we used and that would have to be turned over. And in front of a jury, that to me is that a -- it's over." (Tr. at 211-212.) Even Dr. Fisher acknowledged that it was a "possibility" the essay could be used by the state to show premeditation. (Tr. at 75-76.) Trial testimony by M.G., a student that rode the bus with Lindsey, underscores how damaging additional evidence of premeditation could have been to the defense. "M.G. testified she heard Lindsey say more than ten times that he wanted to kill his mother. The last time she heard him say he hated his mother and wanted to kill her was a week or two before she died." *Lindsey*, 2015-Ohio-2169, at ¶ 18 (10th Dist.). M.G. also heard Lindsey ask another person on the bus where he could get a gun on more than five occasions. *Id.* at ¶ 19. Furthermore, if counsel had pursued a battered child defense, Lindsey would have

been subject to a limited examination by the state's expert concerning the battered child syndrome and its effect on his behavior. *See State v. Goff*, 2010-Ohio-6317, ¶ 58. While an independent evaluator's testimony is restricted in many respects, there is a reasonable possibility that Lindsey would have stated something in the evaluation to implicate himself or undermine his defense. This is most evident in Lindsey's concerning letters to counsel. Lindsey sent counsel one letter that was blood stained and another that included "the words spirits, sole, spirituality and probably ten other words in here and it looks like it's ripped out of a small dictionary." (Tr. at 115.)

{¶ 71} Lindsey contends that the trial court made an erroneous finding that cost was a factor in trial counsel's decision not to retain a domestic violence expert. (Appellant's Brief at 38-39.) While cost was not an explicit justification, counsel certainly addressed their feelings regarding the use of resources and need for a "good faith basis" to request an expert to examine Lindsey for battered child syndrome. (Tr. at 215-217.) Collins questioned whether he had sufficient grounds to present the issue to the judge and testified to his concerns about an expert examining Lindsey for battered child syndrome. "I had concerns because nothing changed from every single psychological or evaluation he ever had. Nothing came out. Nothing was there. That is why I pushed to have the full psych done. So in that situation, there was no evidence to back that up." (Tr. at 221.)

{¶ 72} Shroy agreed with Collins' assessment that the battered-child defense was not the best trial strategy as it would not present well to a jury. According to Shroy, "it didn't seem prudent if the doctors were convinced that this would be a nonintuitive, but explainable reaction, then I would have said that is why they are doctors and I'm a lawyer, and I would have thought maybe it makes sense to use it. But given what we were getting from feedback from the professionals, it didn't seem like that would either, one, play well, or two, be validated by what the doctors were saying." (Tr. at 124.) Given Shroy and Collins testimony, their determination to abandon the battered child syndrome investigation and focus on a self-defense claim as to events immediately before the incident was reasonable.

{¶ 73} For the foregoing reasons, we find that the trial court's denial of grounds one through four based on the determination that counsel's investigation was not deficient was reasonable and not an abuse of discretion.

## 2. Prejudice

{¶ 74} Arguendo, even if we conclude that trial counsel's representation was deficient, we alternatively find the trial court's determination that Lindsey was not prejudiced by counsel's investigation was also reasonable.

{¶ 75} Lindsey contends that based on the three deficient aspects of the investigation there was a "reasonable probability" that counsel's performance affected the outcome of the petitioner's proceedings. *Strickland*, 466 U.S. at 694. We can quickly dispatch with two of Lindsey's cited deficiencies in the investigation, i.e. the failure to acquire the full Children's Services records and failure to speak with Lindsey's probation officer. Regarding the former, Collins reviewed portions of the Children's Services records and Lindsey provided trial testimony as to the freeway incident. (July 10, 2014 Tr. Vol. 3 at 477-478.) We also know L.B. disputed Lindsey's account of events and the case was ultimately dismissed. Regarding the latter, given counsel's conversation with Liston and the victim advocate, Shroy and Collins had some insight into the relationship concerning the delinquency matter. Lindsey has failed to demonstrate that there is a reasonable probability that acquiring the entire Children's Services record or failing to meet with the probation officer affected the outcome of the proceedings. *Strickland* at 694.

{¶ 76} Lindsey argues that because of counsel's failure to consult with a domestic violence expert, he was prejudiced at trial due to ineffective assistance of counsel. (Appellant's Brief at 39.) Lindsey contends that a domestic violence expert would have helped provide the jurors a better understanding of Lindsey's state of mind and a "more complete account of the abuse that Mr. Lindsey suffered would therefore have helped the jurors understand his perception of the threat his mother posed to him and provided relevant insight into why Mr. Lindsey stabbed her seve[ral] times." (Appellant's Brief at 40-41.) According to Lindsey, this evidence would have helped bolster his credibility and would have helped dispel popular misconceptions about domestic-abuse victims. (Appellant's Brief at 41.) Lindsey also takes issue with the trial court's finding that a history of abuse does not justify killing an abuser as such evidence informed his perception of the danger the abuser posed to the individual. (Appellant's Brief at 43.)

{¶ 77} Upon review and consideration of Lindsey's various arguments, we are not persuaded that the failure to consult with, or have testimony from, a domestic violence

expert would have affected the outcome of this trial. Lindsey greatly relied on the testimony from a domestic violence expert to solicit and demonstrate much of his arguments. However, the persuasive value of such testimony from a domestic violence expert, such as Dr. Fisher, is far from certain.

{¶ 78} As an initial matter, Dr. Fisher appears to misunderstand the scope of her potential testimony. Dr. Fisher acknowledged that she included in her report that she "could have testified and prevented Robert from even having to take the stand." (Sept. 29, 2022 Tr. at 60.) It is well established, however, that experts are not permitted to testify to factual statements describing alleged abuse. Evid.R. 802; *State v. Grate*, 2020-Ohio-5584, ¶ 188. Similarly, as Lindsey acknowledged in his reply brief, Dr. Fisher would also not have been able to testify to L.B.'s "prior bad acts in order to show that she was the initial aggressor." (Reply Brief at 14.)

{¶ 79} Given such limitations, even if counsel established Lindsey as a battered child, history of abuse is not a defense to murder. *Nemeth*, 82 Ohio St.3d at 205. "A history of abuse alone does not justify the killing of an abuser. Having been physically assaulted by the abuser in the past is pertinent to such cases only as it contributes to the defendant's state of mind at the time the killing occurred; e.g., in that it formed the basis for the [killer's] perception of being in imminent dangers of severe bodily harm or death at the hands of [the abuser]." (Emphasis omitted.) *State v. Koss*, 49 Ohio St.3d 213, 217 (1990). Generally, battered child syndrome is most relevant in "[n]onconfrontational killings" as they "do not fit the general pattern of self-defense." *Nemeth* at 208. Here, Lindsey consistently stated that he acted in self-defense not based on prior abuse, but out of fear derived from L.B. attacking him with two knives. When a defendant bases their self-defense claim on being physically attacked, "expert testimony on battered [child]syndrome [is] unnecessary to show an honest belief in the imminent danger of death or great bodily harm." *Sallie*, 81 Ohio St.3d at 676. An expert is not required to explain "fight or flight" or provide a basis for a defendant's honest belief in the imminent danger of death or great bodily harm. Moreover, Dr. Fisher's testimony as to why Lindsey did not move out of the residence or report the abuse would have provided little value to the self-defense claim. This is similarly true concerning the value Dr. Fisher might have had in dispelling myths and misconceptions of battered child syndrome. While Lindsey was 19 and physically larger

than L.B., a jury is perfectly capable of understanding why a person was dependent on their mother, and remained in her home, while still in high school. Such a reluctance to leave the home is also informed by Lindsey's testimony that the freeway incident led to a distrust in "the system." (Tr. at 477-478.) An expert would not be necessary to establish why Lindsey did not leave home or report any further abuse.

{¶ 80} Even with additional evidence and expert testimony, we cannot find there is a reasonable probability that a jury would overlook Lindsey's actions during the incident. Lindsey acknowledged that once he gained control of the knife, he could have fled the room instead of stabbing L.B. *Lindsey*, 2015-Ohio-2169, at ¶ 47 (10th Dist.). Despite Lindsey's claim that L.B. might come after him, Lindsey conceded that he left the knife in the room with L.B. and only returned upstairs to retrieve his cellphone. *Id.* At trial, "the coroner indicated Lindsey stabbed [L.B.] a total of seven times, including four stab wounds to her neck; a wound so deep and requiring so much force that it likely caused the knife to bend; and a stab wound through [L.B.]'s ribs and into her lung, causing the lung to collapse. [L.B.] also had several incisive and defensive wounds." *Lindsey* at ¶ 36. Conversely, Lindsey's small puncture wound in his thigh was consistent with a self-inflicted wound. *Lindsey* at ¶ 11. As Lindsey stabbed L.B. seven times, most of which were in the back consistent with someone attacking her from behind, there is no reasonable probability that an expert on battered child syndrome would have affected the result. *Lindsey* at ¶ 12. *Shimel v. Warren*, 838 F.3d 685, 699 (6th Cir. 2016) (finding there was no reasonable probability that an expert on battered woman syndrome would have affected the result as the defendant shot the victim nine times, "seven of which entered his body through his back").

{¶ 81} While we decline to resolve whether the outcome of the aggravated murder charge might have been different, we must at the very least raise the question as to whether the potential inclusion of the essay might have affected the jury's deliberations regarding the charge. If the battered child defense was pursued, counsel appears to have felt required, pursuant to Crim.R. 16, to turn over the essay. As discussed, the Lindsey's essay could be read as evidence of "prior calculation, and the fact that it's hidden in a-- in a safe with a coat hanger and with a picture of a small bruise . . . when you write a paper in 2011 about how to kill a parent and get away with it or you should not be held accountable, that to me is a potential, you know, discoverable paper depending on which trial strategy we used and that

would have to be turned over. And in front of a jury, that to me is that a -- it's over. (Tr. at 211-212.) Again, while we decline to address whether the essay, in fact, would have been required to be disclosed under the facts of this case or whether it would have changed the outcome of Count One, if counsel felt obligated under Crim.R. 16 to disclose the essay, such evidence would undoubtedly have played a major role in the jury's consideration of the aggravated murder charge.

{¶ 82} For these reasons, we find the trial court did not abuse its discretion by denying Lindsey's first, second, third, and fourth grounds for postconviction relief.

### B. Appellant's Second Assignment of Error

{¶ 83} In his second assignment of error, Lindsey argues that the trial court erred by denying Lindsey's seventh ground for postconviction relief without an evidentiary hearing. Lindsey's seventh ground for relief alleges that counsel was ineffective for failing to request, or object to the trial court's failure to provide, a no-duty-to-retreat instruction to the jury.

{¶ 84} While we generally review the denial of a petition for postconviction relief for an abuse of discretion, the trial court denied Lindsey's seventh assignment of error without a hearing, in part, based on res judicata. The applicability of the doctrine of res judicata is a question of law, which we review de novo. *King v. King*, 2019-Ohio-722, ¶ 20 (10th Dist.), citing *Daniel v. Williams*, 2014-Ohio-273, ¶ 18 (10th Dist.).

{¶ 85} The doctrine of res judicata precludes a litigant from raising a claim that they raised or could have raised in a previous proceeding. *State v. Blanton*, 2022-Ohio-3985, ¶ 2, citing *State v. Perry*, 10 Ohio St.2d 175, 180 (1967). A petitioner's claims of ineffective assistance of counsel in a petition for postconviction relief "pose unique challenges" with respect to the application of res judicata, because such claims are often based on evidence outside the record. *Blanton* at ¶ 29. "[R]es judicata does not bar a postconviction ineffective-assistance-of-counsel claim when either (1) the petitioner had the same attorney at trial and on appeal or (2) he must rely on evidence outside the trial record to establish his claim for relief." *Blanton* at ¶ 2. "Where [a] defendant, represented by new counsel upon direct appeal, fails to raise therein the issue of competent trial counsel and said issue could fairly have been determined without resort to evidence dehors the record, res judicata is proper basis for dismissing [the] defendant's petition for postconviction relief." *Blanton* at ¶ 30, quoting *State v. Cole*, 2 Ohio St.3d 112 (1982), syllabus.

{¶ 86} While some claims of ineffective assistance of counsel can be dispatched with on appeal based on evidence entirely in the record, other claims will not be precluded that "truly depend on evidence outside the trial record (for example, a claim regarding counsel's failure to present evidence)." *Blanton* at ¶ 41. "[W]ith respect to postconviction petitions asserting grounds for relief based on ineffective assistance, res judicata does not operate to bar those grounds where the petitioner has submitted competent evidence of ineffective assistance outside of the trial record and where that evidence presents substantive grounds for relief." *State v. Harris*, 2024-Ohio-5404, ¶ 23 (1st Dist.). The Supreme Court set out the following two-part inquiry: "(1) Has the petitioner introduced competent evidence of ineffective assistance that was not included in the trial record? And if so, (2) does that evidence present substantive grounds for relief; that is, if believed, would the newly presented evidence—together with any evidence in the trial record—establish that counsel was ineffective?" *Blanton* at ¶ 33.

{¶ 87} There is no dispute that the issue of the no-duty-to-retreat instruction was raised by Lindsey in his application for reopening. (Appellant's Brief at 45.) In our January 21, 2016 memorandum decision, we rejected the application to reopen, in relevant part, as the trial court's failure to provide the instruction was not plain error and that "Lindsey cannot demonstrate his trial counsel's failure to object to the self-defense instruction amounts to an error so serious that, but for the error, there would be a reasonable probability the outcome of the trial would have been different." *Lindsey*, 14AP-751, at ¶ 13 (Jan. 21, 2016 Memorandum Decision). The trial court denied Lindsey's seventh grounds for relief without a hearing based on res judicata and that this court "previously held that Petitioner's argument fails to meet the second prong of *Strickland*." (Nov. 30 2018 Entry at 28.)

{¶ 88} Here, Lindsey argues that Dr. Fisher's report provides evidence outside the record that was "relevant to [Lindsey's] state of mind and use of force that was presented for the first time in [Lindsey's] amended postconviction petition." (Appellant's Brief at 47.) Dr. Fisher's concluded that Lindsey's reaction to his mother's attack was an understandable fight or flight response that is more intensely experienced by victims of domestic violence. (Appellant's Brief at 48.)

{¶ 89} Upon review, we do not find that Dr. Fisher's report meets the requisite standard. This court has explained that to prevent dismissal of a petition for postconviction relief on the basis of res judicata, the cited evidence outside the trial court record must be "competent, relevant, and material evidence." (Further citation omitted.) *State v. C.W.*, 2023-Ohio-4393, ¶ 15 (10th Dist.), citing *State v. Villareal*, 2022-Ohio-1473, ¶ 9 (10th Dist.). For example, the evidence presented by Blanton to support his ineffective assistance of counsel claim was an affidavit stating he told his attorney certain information that counsel declined to use at trial. *Blanton* at ¶ 50. Here, the report has little bearing on whether counsel should have sought the no-duty-to-retreat instruction, which is the basis for the seventh ground for relief.

{¶ 90} Furthermore, even if Dr. Fisher's report could be considered "evidence of ineffective assistance of counsel," it does not, along with other evidence in the trial record, establish that Shroy and Collins were ineffective. Even if we found that counsel was deficient, for the reasons set forth in this decision and our prior memorandum decision, we cannot find that counsel's failure regarding the jury instruction would have created a reasonable probability that the outcome of the trial would have been different. We reached this conclusion in our prior memorandum decision and, even considering the new evidence, we find no reason to change our initial determination.

{¶ 91} For these reasons, we overrule Lindsey's second assignment of error.

## IV. CONCLUSION

{¶ 92} Having overruled Lindsey's first and second assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and JAMISON, JJ., concur.

————————————